Trevor **REYNOLDS**, et al., Plaintiffs,

v.

**COUNTY OF SAN DIEGO,**
**et al., Defendants.**

**Civil No. 11cv1256 JAH (RBB)**

United States District Court,
S.D. California.

Signed 10/03/2016

Donnie R. Cox, Law Offices of Donnie R. Cox, Oceanside, CA, Paul W. Leehey, Law Office of Paul W. Leehey, Fallbrook, CA, for Plaintiffs.

Christopher John Welsh, David G. Axtmann, Caitlin E. Rae, San Diego, CA, for Defendants.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT BRYSON'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT [DOC. NO. 49], GRANTING IN ITS ENTIRETY DEFENDANTS MEDEIROS AND ZETMEIR'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT [DOC. NO 52], GRANTING IN PART AND DENYING IN PART DEFENDANT COUNTY OF SAN DIEGO'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT [DOC. NO. 55], GRANTING IN ITS ENTIRETY PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT [DOC. NO. 58], GRANTING IN PART AND DENYING IN PART PLAINTIFFS' EX PARTE JUDICIAL NOTICE REQUESTS [DOC. NOS. 137, 141]

## INTRODUCTION

JOHN A. HOUSTON, United States District Judge

Pending before this Court are: (1) Defendant Maya Bryson's motion for summary judgment or partial summary judgment (doc. no. 49.); (2) Defendant Shari Medeiros and Zetmeir's motion for summary judgment or partial summary judgment (doc. no. 52); (3) Defendant County of San Diego's motion for summary judgment or partial summary judgment (doc. no. 55); and (4) Plaintiff Trevor Reynolds, Heather Reynolds, H.R., and R.R.'s motion for partial summary judgment against Defendant County of San Diego (doc. no. 58) on the following issues: (1) County's Policy of Forbidding Parents from Attending Their Child's Examination and Testing at Polinsky Violates the Parents' and H.R.'s Constitutional Rights; (2) The Physical Examination and Testing of H.R. in the Absence of Probable Cause, Court Order, or Exigency Violated the Constitutional Rights of the Plaintiffs; and (3) The 2007 Order Authorizing Health Assessments is Unconstitutional as a General Warrant. This Court heard oral arguments on the motions. After hearing argument by counsel, and a thorough review of the pleadings and exhibits filed, the Court: (1) GRANTS IN PART AND DENIES IN PART Defendant Maya Bryson's motion for summary judgment or partial summary judgment; (2) GRANTS IN ITS ENTIRETY Defendants Shari Medeiros and Zetmeir's motion for summary judgment or partial summary judgment; (3) GRANTS IN PART AND DENIES IN PART Defendant County of San Diego's motion for summary judgment or partial summary judgment; and (4) GRANTS IN ITS ENTIRETY Plaintiff Trevor Reynolds, Heather Reynolds, H.R., and R.R.'s motion for partial summary judgment.

## BACKGROUND

### I. Factual Background

On June 9, 2010, R.R.'s mother, Heather Reynolds left her two minor children, R.R. and H.R., in the care of their father, Trevor Reynolds. At the time, R.R. was six weeks old and H.R. was two years old.

When Heather returned home, she noticed that R.R. was fussy, and difficult to console. Heather took R.R. upstairs to change her diaper and noticed that R.R.'s right hip was at an odd angle. Trevor and Heather immediately took R.R. to Kaiser Permanente's Intermediate Care Services where X-rays were taken. The X rays revealed a displaced femur fracture to R.R.'s left leg. R.R. was transported to Kaiser Zion Hospital where Dr. Richard Newton, a pediatrician, diagnosed R.R. with a completely displaced left femur fracture. Dr. Newton determined the parents did not

have an explanation as to how R.R. was injured. Consequently, Dr. Newton caused Kaiser to report the suspected child abuse to the County of San Diego Child Welfare Services. A child abuse detective with the County Sheriff was also contacted and advised of the incident.

That evening, the on-call social worker, Maya Bryson, investigated the allegations of suspected child abuse after receiving an emergency response referral form stating R.R.'s femur fracture resulted from suspected non-accidental trauma. Bryson consulted with Dr. Newton, Trevor, Heather, and her supervisor, Cheryl Berglund, the deputy sheriff, and the nurse who reported the matter on Dr. Newton's behalf during her investigation. Bryson noted the parents had no explanation for how the injury happened, Heather believed the injury occurred while she was out of the home, and Trevor did not make eye contact and seemed reluctant to answer questions. Dr. Newton could not provide Bryson any opinion on what caused the fracture. After Bryson discussed her findings with Berglund, Berglund decided that the County would use a hospital hold to take R.R. into protective custody. Just before midnight, Heather and Trevor were escorted from the hospital where R.R. was admitted. At 12:01 a.m. on June 10, 2010, Berglund placed a hospital hold on R.R. According to the Health & Human Services Child Welfare Service's Emergency Response Referral Information form, R.R. was due to be released from the hospital on or about June 11, 2010. Bryson presented Heather with a consent form to authorize medical treatment of H.R. and Heather signed the form.

After deciding to place R.R. on a hospital hold, Bryson and Berglund assessed whether to take H.R. into protective custody as well. At the time, H.R. was in the care of his maternal grandmother. In de-ciding to remove H.R. to the Polinsky Children's Center, Bryson and Berglund considered the severe injury to R.R., H.R.'s young age, H.R.'s inability to communicate to report whether he was being abused, and the possibility that the Reynolds' parents could be abusers. On June 9, 2010, at 11:00 p.m., County social worker, Kristie Campbell, and two police officers went to the home of Cathy Howland, R.R. and H.R.'s maternal grandmother, in Oceanside, California and removed H.R. from the home while the officers restrained the maternal grandmother by stepping between her and Campbell. H.R. was taken into protective custody at 11:45 p.m. and placed into Polinsky Children's Center at 12:20 a.m. on June 10, 2010. At approximately 2:00 a.m. on June 10, 2010, R.R.'s grandmother visited R.R. at Kaiser.

Thereafter, on June 10, 2010, County Social Worker Shari Medeiros and her supervisor, Laura Zetmeir, were assigned to take over the case from Bryson. Medeiros continued the investigation of the child abuse allegations by interviewing Trevor, Heather, and other family members. Trevor indicated he had no additional information to add concerning R.R.'s injury. Medeiros advised the parents that they could have supervised contact with their child.

On June 11, 2010, Medeiros obtained assistance from Dr. Marilyn Kaufhold, a child abuse expert at Rady's Children's Hospital. Dr. Kaufhold opined, "[t]he femur fracture is the result of trauma and is highly concerning for child abuse in this baby that otherwise seems to be a normal, healthy infant ... fractures do not occur in infants as a result of normal usual child care." (Doc. No. 70–1, p. 11.) Additionally, Medeiros spoke to Trevor and Heather over the telephone. Trevor confirmed that on morning of June 9, 2015, Heather went upstairs to change R.R. Heather opined that H.R. caused R.R.'s injury while Tre-

vor was asleep on the couch, possibly by stepping on R.R., who was also on the couch.

On June 11, 2010, Medeiros initiated and filed the juvenile dependency petitions in the Juvenile Court of San Diego County. Medeiros summarized her investigation and attached key documents regarding her investigation in a detention report. A detention hearing was held on June 14, 2010. At the hearing, the court found that Defendants made a prima facie showing on the allegations contained in the petition. Specifically, the court found detention was necessary because of the substantial risk to the children's physical health. The court also found that continued care in the parents' home was contrary to the children's welfare. Medeiros arranged for the children to return to their own home by June 15, 2010 under the care of their paternal grandmother.

From June to August 2010, Medeiros continued to investigate the case as it went through the juvenile court process. Medeiros made contacts with the parents, family members, service providers, the investigating detective, doctors, the children, and her supervisor, Laura Zetmeir. She also prepared a jurisdiction report, the disposition report, and addendum report.

Plaintiffs allege Medeiros submitted Trevor's name to the Child Abuse Central Index ("CACI") for a substantiated allegation of severe neglect on June 21, 2010 and was not removed from the CACI until on or after September 22, 2010.

On June 30, 2010, Medeiros collected the medical history of the R.R. and H.R.'s parents and supplied it to Dr. Kaufhold. Dr. Kaufhold reviewed the parents' medical histories and wrote a letter indicating, "[w]hile I cannot dismiss the possibility of inflicted injury, I would recommend that [R.R.] have a genetics consult to consider the possibility of osteogenesis imperfecta ("OI," or brittle bone disease)." (Dr. Kaufhold's Letter, Doc. No. 70-6, p. 3.) Thereafter, Dr. Nunes, a pediatrician specializing in OI examined R.R. at Kaiser Hospital. Dr. Nunes opined that more than likely R.R. has OI, but it was just "one piece of the puzzle" and it was possible both OI and abuse could be present. (Doc. No. 89-7, p. 2.)

On July 23, 2010, Heather met with Medeiros to provide her with a medical report showing she had been diagnosed with OI. Heather advised Medeiros that she was anticipating a separate report from Dr. Nunes regarding the likelihood that R.R. had OI as well. On July 27, 2010, Dr. Nunes provided Medeiros his report indicating that it was likely that R.R. had OI as well.

On July 28, 2010, the Juvenile Court held a settlement hearing. Medeiros contends that Dr. Nunes' findings of OI were discussed. Plaintiffs contend Medeiros deliberately concealed this exculpatory evidence from the Court. The hearing was continued until August 18, 2010.

On July 30, 2010, Heather was authorized to move back into the family home to care for the children under the supervision of the two grandmothers.

On August 18, 2010, the Juvenile Court held the continued settlement hearing. Heather refused to undergo genetic testing and the Court declined to issue an order requiring her to do so. The case did not settle. The next day, on August 19, 2010, the Juvenile Court dismissed the action, upon the agency's request, and both children were returned to their parents' custody.

II. Procedural History

Plaintiffs filed the instant complaint on June 8, 2011, seeking monetary relief, including punitive damages, against defen-

dants based on eight separate allegations: (1) assault, (2) battery, (3) false imprisonment, (4) violation of civil rights, (5) Monell related claims, (6) intentional infliction of emotional distress, (7) violation of state civil rights—pursuant to Cal. Civ. Code § 43, and (8) violation of state civil rights pursuant to Cal. Civ. Code § 52.1.

Bryson's [1] motion for summary judgment was filed on January 10, 2014. Plaintiffs filed an opposition to the motion on February 14, 2014 and Bryson filed a reply thereto on March 5, 2014. On February 24, 2014, Plaintiffs filed an amended complaint to name two doe defendants, Kristie Campbell and Cheryl Berglund. On November 25, 2014, Berglund filed a motion to join in Bryson's motion for summary judgment (doc. no. 131) and Plaintiffs opposed the motion.

Medeiros and Zetmeir's motion for summary judgment was filed on January 13, 2014. Plaintiffs filed an opposition to the motion on February 14, 2014 and Medeiros and Zetmeir filed a reply on March 5, 2014.

County's motion for summary judgment was filed on January 13, 2014. Plaintiffs filed an opposition to the motion on February 14, 2014 and County filed a reply on March 5, 2014.

Plaintiffs filed a cross motion for partial summary judgment against County on January 13, 2014. County filed an opposition to the motion on February 14, 2014 and Plaintiffs filed a reply on March 5, 2014.

On June 16, 2014, with leave of court, Plaintiffs filed supplemental objections and motions to strike the declarations of Dr. Wendy White. Defendants responded in opposition on July 3, 2014 and Plaintiffs filed a reply on July 21, 2014.

The hearing date on the motions was rescheduled, several times, both on the Court's own motion and upon request from the parties. The motions were eventually heard before this Court. After hearing arguments of counsel, the Court took the matter under submission.

On April 1, 2015, Plaintiffs requested ex parte that the Court take judicial notice of certain documents filed in Swartwood v. County of San Diego, et al., Case No. 3:12–cv–1665 W (BGS). Defendants filed an opposition to the Plaintiffs' request on April 7, 2015. On July 17, 2015, Plaintiffs also requested ex parte that the Court take judicial notice of the Ninth Circuit's decision in Kirkpatrick v. County of Washoe, 792 F.3d 1184 (9th Cir. 2015), which the Court of Appeals filed on July 10, 2015. Defendants did not object to Plaintiffs' request.

## DISCUSSION

### I. Legal Standard

Summary judgment is properly granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party moving for summary judgment bears the initial burden of establishing an absence of a genuine issue of material fact. Celotex, 477 U.S. at 323, 106 S.Ct. 2548. Where the party moving for summary judgment does not bear the bur-

---

1. This Order references parties and witnesses by their last name. However, where multiple parties or witnesses share the same last name, they will be referred to by their first name.

den of proof at trial, it may show that no genuine issue of material fact exists by demonstrating that "there is an absence of evidence to support the non-moving party's case." Id. at 325, 106 S.Ct. 2548. The moving party is not required to produce evidence showing the absence of a genuine issue of material fact, nor is it required to offer evidence negating the moving party's claim. Lujan v. National Wildlife Fed'n, 497 U.S. 871, 885, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990); United Steelworkers v. Phelps Dodge Corp., 865 F.2d 1539, 1542 (9th Cir. 1989). Rather, the motion may, and should, be granted so long as whatever is before the District Court demonstrates that the standard for the entry of judgment, as set forth in Rule 56(c), is satisfied." Lujan, 497 U.S. at 885, 110 S.Ct. 3177 (quoting Celotex, 477 U.S. at 323, 106 S.Ct. 2548).

Once the moving party meets the requirements of Rule 56, the burden shifts to the party resisting the motion, who "must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Without specific facts to support the conclusion, a bald assertion of the "ultimate fact" is insufficient. See Schneider v. TRW, Inc., 938 F.2d 986, 990–91 (9th Cir. 1991). A material fact is one that is relevant to an element of a claim or defense and the existence of which might affect the outcome of the suit. The materiality of a fact is thus determined by the substantive law governing the claim or defense. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987)(citing Anderson, 477 U.S. at 248, 106 S.Ct. 2505).

## II. Evidentiary Issues

Plaintiffs move to strike the lodgment of documents submitted in support of Defen-

dants Bryson, Medeiros and Zetmeir, and County's motion for summary judgment. Plaintiffs also filed objections to the declarations of Defendant Bryson, Defendant Berglund, Mark Lane, Defendant Medeiros, Norma Rincon, Leesa Rosenberg, and Dr. Wendy Wright.

### A. Motion to Strike Lodgment of Documents

Plaintiffs argue Rule 7.1(f)(2) of the Local Rules of Practice for the United States District Court for the Southern District of California requires that the lodgments "must be served and filed with the notice of motion" and the failure to do so "may be deemed as a waiver of the motion." The language of Local Rule 7.1(f)(2) permitting waiver of a motion when a party fails to comply with the rule is permissive, not mandatory. Furthermore, in the interest of justice, this Court may waive the applicability of the local rules. See CivLR 1.1(d). The Court finds that in the interest of justice, Plaintiffs' motion to strike Defendants' documents is DENIED.

### B. Plaintiffs' Objections to Declarations

Plaintiffs object to specific portions of the declarations of Defendant Bryson, Defendant Berglund, Mark Lane, Defendant Medeiros, Norma Rincon, Leesa Rosenberg, and Dr. Wendy Wright one or more of the following grounds: inadmissible hearsay, improper lay and expert opinion, speculative and lack of personal knowledge, and irrelevant. Plaintiffs further object and move to strike the declarations of Norma Rincon and Leesa Rosenberg as sham affidavits. Based upon the information contained in the extensive exhibits filed by the parties, the Court finds it unnecessary to consider many of the objected to portions of the declarations in

making its determination on the motion. The declarations include information already contained in previously filed exhibits (e.g. depositions, agency, reports, court transcripts and orders). The declarations also include some information not relevant to the Court's consideration of the motion. As such, to the extent the Court has not relied on the evidence that is subject to Plaintiffs' objections, the objections are DENIED AS MOOT.

However, in the following instances where the Court has considered the evidence that is subject to Plaintiffs' objections, this Court makes the following findings:

> Plaintiffs object to Paragraphs two (2), three (3), six (6), seven (7), nine (9), and twelve (12) of Defendant Bryson's declaration (Doc. No. 49–2) as misstating the evidence, lacking foundation, inadmissible lay opinion, irrelevant and/or inadmissible hearsay; Paragraphs two (2), three (3), and six (6) of Defendant Berglund's declaration (Doc. No. 49–3) on the grounds that it misstates the evidence, are inadmissible hearsay, speculative, provides inadmissible lay opinion, and/or lacks personal knowledge; and Paragraphs five (5), six (6), seven (7), ten (10), and twelve (12) of Defendant Medeiros' declaration (Doc. No. 52–2) on the grounds that it provides improper legal opinion, is irrelevant, lacks personal knowledge, and/or is inadmissible hearsay.

 Statements and decisions made by Defendants Bryson, Berglund and Medeiros as to their evaluation of the investigative evidence including statements and observations perceived by and obtained from witnesses may be utilized by defendants to determine whether the collected facts, observations and reasonable inferences therefrom support reasonable cause to take the action complained of. The investigators may draw on their own experiences and specialized training to make inferences and deductions about the available cumulative information. U.S. v. Arvizu, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). Additionally, the collective knowledge doctrine allows knowledge obtained by one investigator to be imputed to other investigators for purposes of evaluating reasonable cause. U.S. v. Villasenor, 608 F.3d 467, 475 (9th Cir. 2010). The doctrine applies here where information obtained during the investigation is communicated to others, including a supervisor, and where the investigators do not explicitly communicate all of the facts each has independently learned so long as there has been some communication among them. U.S. v. Ramirez, 473 F.3d 1026, 1032 (9th Cir. 2007). It is through this lens that the Court determines whether a reasonable officer in the Defendants' position would have reasonable cause under the circumstances to take the challenged action. Thus, the objections to declarations filed Bryson, Berglund and Medeiros by Plaintiffs are OVERRULED.

### C. Plaintiffs' Requests for Judicial Notice

Plaintiffs request this Court take judicial notice of sixteen documents:

1. Order Authorizing Health Assessments and Immunizations Prior to Detention Hearing and Filing of Petition under Welfare & Institutions Code § 300, dated 8/27/98;

2. Order Authorizing Health Assessments and Immunizations Prior to Detention Hearing and Release of Information Concerning Health Care Provided Pursuant to this Order dated 2/01/07

3. American Academy of Pediatrics Health Care of Young Children in Foster Care;

4. An opinion by this Court, <u>Parkes v. Cnty. of San Diego</u>, 345 F.Supp.2d 1071 (S.D. Cal. 2004);

5. County of San Diego's CPS Hold Policy;

6. Heather Reynolds' Response to Defendant's Request for Admission No. 14;

7. The County of San Diego's Drug Endangered Children Protocol;

8. California Welfare and Institutions Code § 306;

9. California Welfare and Institutions Code § 309;

10. Order Regarding Discovery Expert Dispute Concerning Expert Designation in <u>Mann v. Cnty. of San Diego</u>, No. 3:11-CV-0708-GPC-BGS, 2013 WL 4046642 (S.D. Cal. Aug. 8, 2013);

11. County of San Diego's Physical Abuse Protocol;

12. County of San Diego's Submitting Additional Information Protocol;

13. County of San Diego's Medical Opinions—Physical Abuse Protocol;

14. <u>Swartwood v. Cnty. of San Diego</u>, 84 F.Supp.3d 1093 (S.D. Cal. 2014); and

15. A recent advisement by County of changes being made at Polinsky as a result of a decision made in <u>Swartwood</u>

16. <u>Kirkpatrick v. Cnty. of Washoe</u>, 792 F.3d 1184 (9th Cir. 2015) (<u>See</u> Doc. Nos. 58–2, 77–3, 123, 134, 137, 141.)

■ A court may take judicial notice of facts "not subject to reasonable dispute" because they are either "(1) generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201. Taking judicial notice of findings of fact from another case exceeds the limits of Rule 201. <u>See</u> <u>M/V Am. Queen v. San Diego Marine Constr. Corp.</u>, 708 F.2d 1483, 1491 (9th Cir. 1983). Under Rule 201(c), the Court must take notice if requested by a party and if supplied with the necessary information. Under Rule 201(d), the court may take judicial notice at any stage of the proceeding.

■ With respect to Plaintiffs' request that the Court take judicial notice of one circuit court case, two district court cases, and two statutes, the request is DENIED, as judicial notice is reserved for notice of adjudicative facts only. <u>See</u> Fed. R.Evid. 201(a). The Court has nonetheless reviewed and considered the cases and statutes as set forth herein. With respect to certain documents and records filed in <u>Mann</u> and <u>Swartwood</u>, this Court finds it improper to take judicial notice of the truth of the factual findings discussed therein. Also, the Court finds it improper to take judicial notice of fact findings made by those courts because those are not facts not subject to reasonable dispute. <u>See</u> Fed. R.Evid. 201(b). The request is DENIED. With respect to all other documents, the Defendants have not opposed Plaintiffs' request or disputed the authenticity of the documents. Accordingly, the Court GRANTS Plaintiffs' request as to the documents not otherwise discussed herein.

## III. Analysis

### A. Section 1983 Claims

Plaintiffs allege Defendants removed and detained the children in violation of Plaintiffs' Fourth and Fourteenth Amendment rights.

#### 1. Qualified Immunity

Defendants Bryson, Medeiros, and Zetmeir argue they are entitled to summary judgment because qualified immunity bars

Plaintiffs' claims for violation of their Fourth and Fourteenth Amendment rights to be free from unlawful search and seizure and interference with their familial relationship. (Doc. Nos. 49–1, pp. 21–24; 52–1, pp. 18–21.) Specifically, Defendant Bryson contends that exigent circumstances existed the night of June 9, 2010 which warranted her reasonable belief that R.R. and H.R. needed to be detained. (Doc. No. 49–1, pp. 18–20.) Bryson argues that neither placing a hospital hold on R.R. nor taking H.R. to Polinsky Children's Center was unreasonable or malicious. (Id.) Bryson asserts qualified immunity bars Plaintiffs' section 1983 claim as a reasonable official could have believed her conduct was lawful. (Doc. No. 49–1, pp. 21–24.) Likewise, Defendants Medeiros and Zetmeir argue that exigent circumstances justified both the initial removal and continued detention, until June 14, 2010, of R.R. and H.R. because the children were believed to be at risk of severe injury if left in their parents' care. (Doc. No. 52–1, pp. 16–18.) Medeiros also contends qualified immunity bars Plaintiffs' claims against their conduct prior to the June 14, 2010 Detention hearing because her actions and recommendations were reasonable. (Doc. No. 52–1, pp. 18–21.)

Plaintiffs contend genuine disputed issues of material facts exist surrounding June 9, 2010 as Defendant Bryson had no reasonable cause to believe either child was in imminent danger of serious bodily injury from either of their parents at the time the hospital hold was placed upon R.R. and H.R. was detained. (Doc. No. 78, pp. 11–16.) Also, Plaintiffs point out that there was no reasonable belief the children would be harmed before a warrant could be obtained. (Doc. No. 78, pp. 16–17.) Plaintiffs argue Defendant Bryson's claim of qualified immunity should be defeated because she should have known that her

actions violated the Plaintiffs' clearly established rights.

■ The issues raised regarding qualified immunity can be divided into four events: (1) the claim against Defendants Bryson and Berglund for their decision to remove R.R. from Trevor and Heather's custody and H.R. from his maternal grandmother's, Cathy Howland's, custody; (2) the claim against Defendants Medeiros and Zetmeir for the continued detention of R.R. and H.R.; (3) the claim against all individual Defendants for fabricating evidence in the juvenile court proceeding; and (4) the claim against Defendant Medeiros for listing Trevor Reynolds on the Child Abuse Central Index (CACI).

■ Qualified immunity protects government officials from liability for civil damages as long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)(citing Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Id.

■ In Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court mandated a two-step approach to evaluating qualified immunity. First, the court must consider whether, "taken in the light most favorable to the party asserting injury", the facts alleged show the officer's conduct violated a constitutional right. Id. at 201, 121 S.Ct. 2151. Second, the court must consider whether the right that was violated was clearly

established. Id. The inquiry is whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. (citing Wilson v. Layne, 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). In the Ninth Circuit, courts assess qualified immunity using a two-part analysis: "1) Was the law governing the official's conduct clearly established? 2) Under the law, could a reasonable [official] have believed the conduct was lawful?" Rogers v. Cnty. of San Joaquin, 487 F.3d 1288, 1296–97 (9th Cir. 2007) (quoting Carnell v. Grimm, 74 F.3d 977, 978 (9th Cir. 1996) (internal citation omitted)).

■■■ However, Saucier's two-step approach is no longer mandatory. Pearson, 555 U.S. at 236, 129 S.Ct. 808. Instead, district courts may exercise discretion in deciding which of the two prongs should be addressed first. Id.

a. Clearly Established Right

Plaintiffs contend the decisions in Wallis[2], Parkes[3], Rogers, and Greene[4] all confirm the clearly established law on removal of children well before the removal of R.R. and H.R. on June 9, 2010. (Doc. No. 78, pp. 11–13.) Bryson and Berglund contend Plaintiffs' rights were not clearly established because "no case has held that in similar circumstances, in which a six-week old suffered an unexplained femur fracture while in her parents care, exigency did not exist and it would be unlawful to remove the child and her two year old sibling from their parents' care." (Doc. No. 96, p. 8.)

■■■ A right is 'clearly established' if at the time the constitutional violation occurred, it would have been clear to a reasonable officer that his conduct was unlawful in the situation he confronted. Saucier, 533 U.S. at 202, 121 S.Ct. 2151. "If the law did not put the official on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." Id. Courts should not conduct an inquiry into whether a right is clearly established at a "high level of generality." Brosseau v. Haugen, 543 U.S. 194, 199, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004). Instead, the inquiry must be made in a more "particularized sense" (id.) and "on a more specific level." Saucier, 533 U.S. at 200, 121 S.Ct. 2151. Even so, a case need not be on "all fours" with the facts of the instant case. See Rogers, 487 F.3d at 1297.

■■■ By "1993, it was clear that a parent ... could not be summarily deprived of custody without notice and a hearing, except when the children were in imminent danger." Ram v. Rubin, 118 F.3d 1306, 1310 (9th Cir. 1997). Parents and children have a liberty interest protected by the Fourteenth Amendment's guarantee that parents and children will not be separated by the state without due process except in an emergency. Wallis v. Spencer, 202 F.3d 1126, 1138 (9th Cir. 1999). Officials may remove a child from his or her parents without judicial authorization only if they have "reasonable cause to believe the child is in imminent danger of serious bodily injury" and the scope of removal was reasonably necessary to avert the specific injury. Id.

■■■ The Fourth Amendment also protects children from removal from their

---

2. Wallis v. Spencer, 202 F.3d 1126 (9th Cir. 1999).

3. Parkes v. Cnty. of San Diego, 345 F.Supp.2d 1071 (S.D.Cal. 2004).

4. Greene v. Camreta, 588 F.3d 1011 (9th Cir. 2009).

homes [without prior judicial authorization] absent such a showing. Rogers, 487 F.3d at 1294 (citation omitted). Officials, including social workers, who remove a child from home without a warrant must have reasonable cause to believe that the child is likely to experience serious bodily harm in the time that would be required to obtain a warrant. Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs., 237 F.3d 1101, 1106 (9th Cir. 2001); see Rogers, 487 F.3d at 1294 ("Serious allegations of abuse that have been investigated and corroborated usually give rise to a 'reasonable inference of imminent danger sufficient to justify taking children into temporary custody' if they might again be beaten ... during the time it would take to get a warrant."). The scope of intrusion is exceeded when officials had time to obtain a warrant due to a lack of exigent circumstances, but failed to do so prior to removal. Rogers, 487 F.3d at 1297–98. An intrusion is reasonably necessary if "specific, articulable evidence" provides reasonable cause to believe that a child is in imminent danger of substantial injury. Id. Prior to removal, officials must have pursued "reasonable avenues of investigation." Id. "Whether a reasonable avenue of investigation exists ... depends in part upon the time element and the nature of the allegations." Id.; see Mabe, 237 F.3d at 1107; see also Rogers, 487 F.3d at 1294.

Courts have addressed parents' Fourteenth Amendment and children's Fourth Amendment claims when the children were unlawfully seized and removed from their parents' custody together using the same legal standard. See Wallis, 202 F.3d at 1137 n. 8; see also Doe v. Lebbos, 348 F.3d 820, 826 fn. 9 (9th Cir. 2003). "Summary judgment in favor of the defendants is improper unless, viewing the evidence in the light most favorable to the plaintiffs, it is clear that no reasonable jury could conclude that the plaintiffs' constitutional rights were violated." Wallis v. Spencer, 202 F.3d at 1138.

In the Ninth Circuit, a reasonable official would have known that clearly established law barred summarily depriving parents custody of their children without notice and a hearing unless the children were in imminent danger. In 2010, when R.R. and H.R. were removed, the law was clearly established such that a reasonable social worker would understand that a child could not be removed from their parents' custody without prior notice and a hearing absent evidence of imminent danger. Here, there is no dispute that the complaint alleges Bryson and Berglund did not have a warrant to remove either R.R. or H.R. from their parents' custody. (Doc. No. 1, ¶ 23.) As such, Bryson and Berglund unlawfully violated Plaintiffs' constitutional rights unless, at the time of removal, reasonable cause existed to believe R.R. and H.R. were in imminent danger of serious bodily injury from Trevor and Heather or Howland, and that the scope of their intrusion was reasonably necessary to avert the specific injury.

Accordingly, the Court's determination turns on whether it was reasonable to believe that R.R. and H.R. were in imminent danger of serious bodily injury and the removal was reasonably necessary under the circumstances. Burke v. Cnty. of Alameda, 586 F.3d 725, 731 (9th Cir. 2009).

b. Removal[5] of R.R. and H.R.

Plaintiffs argue Defendants Bryson and Berglund violated their Fourth and Fourteenth Amendment rights when they de-

---

5. Removal, as used herein, refers to the use of a "hospital hold" to take R.R. into protective custody and the placement of H.R. at Polinsky

Children's Center on the night of June 9, 2010.

cided to remove R.R. and H.R. from their parents' custody without due process and without exigent circumstances. (Doc. No. 78, pp. 11–18.) Plaintiffs also allege Shari Medeiros violated their constitutional rights by preventing them from having unsupervised custody of their children until August 18, 2010. (Doc. No. 1, ¶¶ 30, 38.)

1. Initial Removal of R.R. and H.R.

a. Hospital Hold of R.R.

 Defendants Bryson and Berglund contend the removal of R.R. was justified because: (1) R.R. was a non-ambulatory, six week old infant child who had a fractured femur, a serious injury; (2) a bruise was observed on R.R.'s chest; (3) during the social worker's interview with Trevor he failed to make eye contact with and had inappropriate, flat affect; (3) Trevor, Heather, and R.R.'s maternal grandmother had access to R.R. during the time she was injured, but were unable to give an explanation as to how the injury occurred; (4) the doctors believed that R.R.'s injuries were non-accidental; and (5) removal was permitted by County policy which allowed a "hospital hold" to be placed on a child with sever injuries when the physician suspects non-accidental causes. (Doc. No. 49–1, p. 19.) Defendants further assert the removal of H.R. was justified because his sibling, R.R. had suffered a serious injury and H.R. was young, nonverbal, and was otherwise going to be in custody of the suspected abuser. (Id.)

In response, Plaintiffs argue Defendant Bryson failed to investigate and obtain "specific, articulable evidence" to show that R.R and H.R. were in imminent danger of abuse. (Doc. No. 78, pp. 13–16.) Specifically, Plaintiffs argue that: (1) Bryson failed to conduct a proper investigation because she did not contact a child abuse expert prior to removal of R.R.; (2) Heather was not a suspect and the children should not have been removed from

her custody; (3) there was ample time to obtain a court order authorizing removal because R.R. was not due to be released from the hospital until June 11, 2010, two days after removal occurred. (Doc. No. 78, pp. 13–18.)

The evidence demonstrates Bryson and Berglund reasonably believed exigent circumstances existed and placing a hospital hold on R.R. was reasonably necessary. Trevor and Heather could not explain how R.R. suffered a completely displaced femur fracture of her left leg. (Doc. No. 87–7 at 2.) Bryson noted that Trevor was visibly tired, appeared distracted, and did not appear phased when Bryson explained that the "worst case scenario" could result in a child being taken into custody. (Doc. No. 87–7 at 3–5.) While interviewing Heather, Heather expressed that she was "a little out of it." (Doc. No. 87–7 at 5.) Heather's responses distanced herself and Trevor from liability and suggested the injury could have been caused by H.R. Accordingly, Heather and Trevor could not be ruled out as the suspected abuser because either parent could have caused R.R.'s injury, or at the very least, was shielding the true abuser from responsibility. (Doc. No. 74–3, p. 4.)

In addition, Bryson pursued reasonable avenues of investigation given the time and nature of the allegations. R.R. was brought into the hospital on June 9, 2010. While the record evidences that R.R. was not scheduled for release until June 11, 2010, there is also some evidence to suggest that Dr. Newton and Bryson were uncertain as to when R.R. would be released. (Doc. No. 49–2, p. 3.) Bryson noted Dr. Newton advised her that R.R.'s injury resulted from non-accidental trauma and both parents did not seem appropriate because Trevor did not make eye contact and they were more concerned about their day than R.R. (Doc. No. 87–7 at 4.) Bryson's investigation

uncovered sufficient evidence to create a reasonable belief, at the time of the hospital hold, that R.R. was in imminent danger of serious bodily injury. In her declaration, Bryson states that she was concerned that the hospital would not prevent the parents from taking R.R. from the hospital. (Doc. No. 49–2, p. 3.) The Court finds that a reasonable official in Bryson's position could believe the hospital hold was lawful due to exigent circumstances, R.R.'s injury, evidence revealed from Bryson's diligent investigation, and Bryson's continued concern for R.R.'s safety if released into her parents' custody. Thus, qualified immunity bars Plaintiffs' section 1983 claim against Defendant Bryson and Berglund for the initial hospital hold placed on R.R and Defendant Bryson's motion for summary judgment is GRANTED on this issue.

### b. H.R.'s Removal from Howland's Home

▉▉ In deciding to remove H.R. into protective custody, Bryson contends exigent circumstances existed for the following reasons: (1) H.R. was two years old; (2) H.R. was at an age where he might not be able to tell others about possible abuse; (3) inferring from R.R.'s abuse, H.R. may also have been injured or suffered abuse; (4) even if one parent was not an active abuser, they may not have been protecting the children from the abusive parent; and (5) H.R. was readily accessible to the parents and grandmother who were present around the time R.R. was injured. (Doc. No. 49–1, pp. 19–20.)

The Court is not persuaded that the initial removal of H.R. from his grandmother's home was justified by the circumstances surrounding R.R.'s hospital hold detention and H.R.'s age. The evidence provides no exigency upon which H.R.'s removal is warranted and the circumstances justifying R.R.'s hospital hold were not present concerning H.R. Despite H.R.'s age and capacity to convey any possible abuse, the emergency referral Bryson investigated concerned R.R. only. (Doc. No. 49–3, p. 1.) Although a County "hospital hold" was permitted on R.R. after the treating physician suspected non-accidental trauma, no doctor indicated any concern about potential injury to H.R. Bryson asserts that she could not be sure that H.R. was not injured or could be injured if left in his parents' or grandmother's care because all three were present when R.R.'s injury was discovered. However, viewing the evidence in the light most favorable to the Plaintiffs, an inference can be made that if H.R. was injured the Reynolds would have brought him to the hospital as they did for R.R.'s apparent injury. Also, R.R.'s parents planned to be at the hospital all night, before the hospital hold was imposed. (Doc. No. 89–1, p. 3.) Therefore, the Court finds Bryson and Berglund cannot rely on R.R.'s removal to justify the removal of H.R.

In addition, Bryson failed to conduct an investigation of Howland in spite of her contention that she could not dismiss Howland as a suspected abuser. While this case does not involve a notable gap in time like Calabretta[6] or Rogers[7], Bryson's failure to take prompt investigatory action as to

---

**6.** Calabretta v. Floyd, 189 F.3d 808, 813 (9th Cir. 1999) (concluding the child welfare worker could have obtained a warrant and no exigency existed when the worker visited a home on referral of child abuse and returned 14 days later to remove the child against the mother's wishes).

**7.** Rogers, 487 F.3d at 1297 (finding social services lacked exigency to remove two children after eighteen (18) days had passed by the before the social worker visited the home to investigate).

Howland, as she did with other suspected abusers, demonstrates she had no reason to believe H.R. faced imminent danger of serious harm. Bryson did not have specific, articulable facts amounting to reasonable cause to believe H.R. was in imminent danger at Howland's home. Also, Bryson and Berglund have not shown a likelihood that H.R. would experience serious bodily harm in the time that would be required to obtain a warrant before H.R. was removed from Howland's house. As such, no reasonable social worker would believe exigent circumstances justified H.R.'s removal without any investigation. The Court finds where no reasonable avenue of investigation was pursued as to Howland, Bryson could not have reasonable cause to conclude that H.R. was in imminent danger of serious injury at her house. Accordingly, qualified immunity does not bar Plaintiffs' section 1983 claim against Defendants Bryson and Berglund for their decision to remove H.R. from his grandmother's home.

Also, the Court concludes a genuine dispute of material fact exists concerning whether Bryson and Berglund had reasonable cause to believe exigency existed permitting H.R.'s removal. Therefore, Defendant Bryson's motion for summary judgment is DENIED on this issue.

### 2. Continued Detention of R.R. and H.R.

■ In the complaint, Plaintiffs allege Medeiros and Zetmeir violated their Fourth and Fourteenth Amendment rights when they continued to detain R.R. and H.R. without due process of law and without exigent circumstances. (Doc. No. 1, ¶ 30, 38.)

Medeiros and Zetmeir argue they are entitled to summary judgment because R.R. and H.R.'s continued out of home detention from June 10, 2010 to June 14, 2010 did not violate Plaintiffs' civil rights because exigent circumstances existed at the time of removal until the juvenile detention hearing on June 14, 2010. (Doc. No. 52–1, pp. 15–18.) Specifically, Medeiros argues that exigent circumstances existed because R.R. had a severe leg injury, the parents had no explanation as to its cause, and two doctors, Dr. Newton and Dr. Kaufhold, suspected the injury was non-accidental or highly concerning for child abuse. (Doc. No. 52–1, pp. 16–18.) In opposition, Plaintiffs argue a violation of their rights occurred as a result of Medeiros and Zetmeir failing to return and continuing to detain the children when they were not at imminent risk of harm from Trevor or Heather. (Doc. No. 79, pp. 13–17.)

The issue is whether it would be clear to a reasonable officer that the continued detention of R.R. and H.R. was unlawful in the situation confronted by Medeiros and Zetmeir.

Plaintiffs cite to the same authority addressing a warrantless removal of a child to support their contention that the law is clearly established as Plaintiffs' Fourth and Fourteenth Amendment rights regarding the continued detention of a child. (Doc. No. 79, pp. 15–16, 18.) Specifically, Plaintiffs cite to this Court's decision in Parkes, 345 F.Supp.2d at 1071, to argue that there is a genuine dispute as to whether a social worker reasonably believes that the continued detention of a child is reasonable. (Doc. No. 79, pp. 15–16.)

In Parkes, this Court found that a genuine issue of fact existed as to whether a reasonable social worker could believe continuing the detention of the children prior to the hearing was reasonable. Parkes, 345 F.Supp.2d at 1090. Under Parkes, a reasonable social worker would understand that she violates a family's constitutional rights when she does not perform an im-

mediate investigation into whether the children's continued detention is necessary to protect them. See Swartwood v. Cnty. of San Diego, 84 F.Supp.3d 1093, 1115 (S.D. Cal. 2014). However, Parkes did not decide whether the law regarding continued detention was clearly established under the instant facts, nor have Plaintiffs pointed to other authority indicating such.

This Court need not decide whether there is a genuine issue of material fact as to a constitutional violation for unlawful continued deliberation in that this Court finds that Medeiros and Zetmeir are entitled to qualified immunity because the law regarding continued detention was not clearly established in June 2010, at the time of events in controversy. See Pearson v. Callahan, 555 U.S. 223, 236–38, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)(the court may determine whether the constitutional right asserted was clearly established at the time of the alleged violation without first determining whether the defendants actually violated a constitutional right.) For this reason, the Court finds that the law was not clearly established at the time Medeiros and Zetmeir continued the detention of R.R. and H.R.

Because no clearly established law existed to put Medeiros and Zetmeir on notice that their conduct would be unlawful, Medeiros and Zetmeir are entitled to qualified immunity as to Plaintiffs' allegation that the continued detention of R.R. and H.R. violated their constitutional rights. Therefore, Defendants Medeiros and Zetmeir's motion for summary judgment on this issue is GRANTED.

c. Use of False, Misleading or Fabricated Evidence

Plaintiffs claim Bryson and Berglund fabricated evidence in their investigation and Medeiros and Zetmeir knew or should have known of that fabrication. (FAC ¶ 43d.)

1. Violation of a Constitutional Right

Medeiros and Zetmeir argue the information contained in the dependency petitions and court reports was accurate. (Doc. No. 52–1, p. 21.) They deny Plaintiffs' allegation that Medeiros withheld Dr. Nunes' report at the settlement conference, and argue that the parties discussed the contents of the report. (Doc. No. 52–1, p. 21.)

"To support a § 1983 claim of judicial deception, a plaintiff must show that the defendant deliberately or recklessly made false statements or omissions that were material to the finding of probable cause." "Whether a false statement was "material" to the finding of probable cause is a question of law for the reviewing court. Greene v. Camreta, 588 F.3d 1011, 1035 (9th Cir. 2009) vacated in part, 563 U.S. 692, 131 S.Ct. 2020, 179 L.Ed.2d 1118 (2011) and vacated in part, 661 F.3d 1201 (9th Cir. 2011).

To sustain a deliberate fabrication of evidence claim, a plaintiff must prove either that: (1) defendants knew or should have known that plaintiffs were innocent, but continued their investigation of plaintiffs; or (2) defendants used investigative techniques that were coercive and abusive and defendants knew or should have known that those techniques would yield false information. Costanich v. Department of Social and Health Services, 627 F.3d 1101, 1111 (9th Cir. 2010). When genuine issues of material fact arise regarding fabrication of evidence in a child abuse investigative report, qualified immunity is inappropriate because credibility is an issue for the trier of fact. Costanich, 627 F.3d at 1111–12.

Mere allegations that defendants used interviewing techniques that were in some sense improper, or that vio-

lated some state regulations, without more, cannot serve as the basis for a claim under § 1983. Costanich, 627 F.3d at 1111 (citing Devereaux v. Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001)). Reporting that a witness said something he or she did not cannot reasonably be characterized as a recording error or a misstatement. Costanich, 627 F.3d at 1113. Alternatively, the substitution or conflation of a word can be reasonably characterized as a misstatement (e.g., reporting the children tested "positive" for child abuse when the declarant stated the tests were "consistent" with child abuse). Id.

Here, much of the dispute between the parties regarding facts alleged in the dependency petitions and court reports centers on the statement, "it is a fracture from non-accidental trauma." Plaintiffs argue that Bryson's omission of the words "suspected" or "concerning" in describing R.R.'s injury constitutes a fabrication of evidence. Plaintiffs also argue that, thereafter, Medeiros and Zetmeir erroneously included the statement in the detention report and wrongfully attributed the statement to Dr. Newton.

In his report, dated June 9, 2010, Dr. Newton noted that R.R. had a "left completely displaced femur fracture" and there was "suspected non-accidental trauma." (Doc. No. 86–3, p. 5, 8.) In HHSA's Delivered Service Log entry on June 9, 2010, Bryson quoted Dr. Newton as telling her during an interview that R.R.'s injury "is a fracture from NAT [non-accidental trauma]." ( Doc. No. 87–7, p. 2.) This same entry by Bryson was later repeated verbatim in the detention report that Medeiros prepared for the juvenile court detention hearing (Doc. No. 70–1, p. 6.) The record also reflects that at least three other statements in the detention report are not effected by Bryson's alleged omission of the of the words "suspected" or "concerning."

The detention report states that: (1) the reason for the detention hearing was that R.R. was diagnosed with a displaced femur fracture and "the injury was suspect for non-accidental trauma" (doc. no. 70–1, p. 3); (2) a hospital hold was placed on R.R., due to concerns of physical abuse (doc. no. 70–1, p. 2); and (3) Dr. Kaufhold indicated R.R.'s femur fracture "is concerning for physical abuse" (Doc. No. 70–1, p. 6).

As the Ninth Circuit stated in Costanich, one way for a reporting party to indicate what a witness has said is through the use of quotation marks:

In the defamation context, the Supreme Court has said: [Q]uotation marks around a passage indicate to the reader that the passage reproduces the speaker's words verbatim. They inform the reader that he or she is reading the statement of the speaker, not a paraphrase or other indirect interpretation by an author. By providing this information, quotations add authority to the statement and credibility to the author's work. Quotations allow the reader to form his or her own conclusions and to assess the conclusions of the author, instead of relying entirely upon the author's characterization of her subject. Costanich, 627 F.3d at 1112 (quoting Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 511, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991) (holding that a jury may find knowledge or reckless disregard of falsity when a publication attributes to the plaintiff quoted statements that the plaintiff never actually made)).

■ Here, Plaintiffs have not shown that the subject verbage in the detention report creates a genuine issue of material fact. While quotations may generally convey a higher degree of authority supporting the statement(s) made, the Court finds the incorporation of Dr. Newton's notes, Dr. Kaufhold's letter in the report, being

read along with Defendants' statements that the reason for the detention hearing was that R.R. was diagnosed with a displaced femur fracture and the injury was suspect for non-accidental trauma and a hospital hold was placed on R.R. due to concerns of physical abuse, along with other expressed investigative facts clearly represents Defendants' challenged statements are no more than a conflation of the collected evidence. Bryson reasonably inferred from the investigative information that the fracture resulted from non-accidental trauma, and, as such, her statements were a fair summary of the evidence at the time. At worst, the omission of the word "suspected" or "concerning" is reasonably characterized as a reporting error or misstatement. Costanich, 627 F.3d at 1113. The omission of the word suspected" or "concerning" did not conceal contrary evidence that would have influenced the decision maker's factual conclusion because the witnesses' original statements were incorporated in the detention report and corroborated by other evidence. As a result, the alleged omission was not material.

As such, Plaintiffs have not shown Defendants deliberately or recklessly made false statements or omissions that were material to the finding of probable cause. Accordingly, no constitutional right was violated by a possible misstatement in the court documents submitted by Bryson, Medeiros, and Zetmeir.

■ Plaintiffs also claim that Medeiros and Zetmeir failed to provide the juvenile court with exculpatory evidence. Specifically, Plaintiffs argue Medeiros received a copy of Dr. Kaufhold's Letter and Dr. Nunes' Report, wherein it was suggested that R.R.'s injury could be due to OI, but failed to produce the documents at the July 28th settlement hearing. Defendants argue the "exculpatory evidence" was discussed at the hearing. First, the hearing before the Juvenile Court was a settlement hearing. It was not an adversarial adjudicative forum designed for presentation of evidence on which the court would have made dispositive findings. Secondly, and importantly, the evidence concerning R.R.'s possible OI condition was not concealed from Plaintiffs. In fact, it was Plaintiffs who were in receipt of the evidence and provided the evidence to Medeiros and Zetmeir on July 27, 2010. Under the circumstances here, whether OI was or was not discussed is not material.

Plaintiffs had a full opportunity to present "their" OI evidence at the settlement hearing and do not suggest why they elected not to do so. At least since June 30th, approximately one month before the settlement hearing, Heather was in communication with a bone specialist regarding the possibility a genetic disorder could have caused R.R.'s injury. Plaintiffs were well aware of the "exculpatory evidence" and had the opportunity to put forth any "exculpatory evidence" on their own behalf. Plaintiffs have presented no case authority to establish that the social worker must present exculpatory evidence that is in the possession of the plaintiffs. Third, while the evidence was somewhat exculpatory, Dr. Nunes' report indicated it was more likely that R.R. has OI, but it was just one piece of the puzzle and it was possible both OI and abuse could be present. And Dr. Kaufhold stated that she cannot dismiss the possibility of an inflicted injury and recommended R.R. have genetic consulting to consider OI. Accordingly, the Court finds no constitutional right was violated even if Medeiros failed to disclose purported exculpatory evidence provided to her by Plaintiffs in a non-adversarial hearing.

In the complaint, Plaintiffs allege Defendants' investigative tactics were coercive in by attempting to force Heather to admit or

agree that Trevor harmed R.R. in order for Heather to regain custody of R.R.[8] The record shows Heather did not provide information as to how R.R. sustained her injury. For that reason, the Defendants could not be sure whether Heather was protecting Trevor's possible abusive conduct and thus could not be certain that R.R. was not in imminent danger of serious bodily harm if returned to Heather.

Construing the facts in the light most favorable to the Plaintiffs, this Court concludes that Plaintiffs have not set forth sufficient facts demonstrating a genuine issue as to whether Defendants Bryson or Medeiros engaged in fabrication of evidence, failed to disclose exculpatory evidence, or obtained testimony by duress. Viewing the facts in the light most favorable to Plaintiffs, the Court finds that Plaintiffs have not established a genuine issue of material fact on this claim.

### 2. Clearly Established Right

Even if a genuine issue of material fact was established, the Court finds the right was not clearly established at the time of the violation. See Marsh v. Cnty. of San Diego, 680 F.3d 1148, 1152 (9th Cir. 2012). Here, the right not to have deliberately fabricated evidence used in a civil juvenile court proceeding was not clearly established until December of 2010 under Costanich.[9] As such, the Court finds a reasonable official would not be on notice under clearly established law that the Defendants' conduct here was unlawful. As such, Defendants Medeiros and Zetmeir are entitled to qualified immunity as to Plaintiffs'

§ 1983 claim concerning fabrication of evidence. Therefore, Defendants Medeiros and Zetmeir's motion for summary judgment on this issue is GRANTED.

### 3. Absolute Immunity

Defendants Medeiros and Zetmeir assert they are entitled to absolute immunity as to the fourth cause of action for their conduct in supplying information to initiate and pursue dependency proceedings. (Doc. No. 52–1, p. 24.) And Defendants assert that, once the Juvenile Court ordered the children detained at the detention hearing on June 14, 2010, they are entitled to absolute immunity for carrying out the Court's order. (Doc. No. 52–1, pp. 24–26.) Defendants further argue detention was justified after the detention hearing from June 14, 2010 to August 18, 2010 because the Agency was abiding by the juvenile court order and carrying out its investigation in a reasonable manner.

 Since social workers may perform similar functions to prosecutors, the Ninth Circuit has held that social workers should also be given absolute immunity when acting in the role of advocates. Meyers v. Contra Costa County Department of Social Services, 812 F.2d 1154, 1157 (9th Cir. 1987). Thus, social workers are entitled to absolute immunity when performing "quasi-prosecutorial functions connected with the initiation and pursuit of child dependency proceedings." Id. Quasi-prosecutorial functions are those instances where a social worker contributes as an advocate to an informed judgment by an

---

**8.** Although in opposition to Defendants Medeiros and Zetmeir's motion Plaintiffs claim Medeiros continually coerced Heather to implicate Trevor in the alleged abuse of R.R., Plaintiffs' claim finds no support in the record, specifically Heather's declaration. (See Doc. Nos. 58–11, 86–1.)Thus, Plaintiffs have not shown a genuine issue of material fact exists and Defendants Medeiros and Zetmeir's

motion for summary judgment is GRANTED on this issue.

**9.** Given the unique distinctions between criminal prosecutions and civil child abuse investigations, the right not to be accused based on deliberately falsified evidence during civil investigations was not clearly established by the Ninth Circuit's decision in Devereaux.

impartial decision maker. Id. Similarly, absolute immunity includes "quasi-judicial" actions in the context of child welfare proceedings, such as the execution of a court order. Coverdell v. Department of Social & Health Services, 834 F.2d 758,764–765 (9th Cir. 1987). However, neither witness nor prosecutorial immunity apply when there are allegations that a social worker made misrepresentations or was deceptive in instituting prosecutorial proceedings. See Beltran v. Santa Clara County, 514 F.3d 906, 908–09 (9th Cir. 2008); Cunningham v. Gates, 229 F.3d 1271, 1291 (9th Cir. 2000).

■■■ Here, any alleged misrepresentations to the dependency court and failure to disclose exculpatory evidence by Medeiros and Zetmeir occurred during the dependency proceedings. Also, present here are Plaintiffs' allegations that Medeiros and Zetmeir fabricated evidence during an investigation and made false statements in a dependency petition affidavit that they signed under penalty of perjury. But as discussed above, Plaintiffs fail to establish a genuine issue of material fact on their claim. Accordingly, Medeiros and Zetmeir are entitled to absolute immunity as to allegations of fabrication of evidence and that was based upon the state judge's detention order. Defendants Medeiros and Zetmeir's motion for summary judgment as to these claims based upon absolute immunity is GRANTED.

d. Listing Trevor Reynolds on the Child Abuse Central Index (CACI)

1. Violation of a Constitutional Right

Plaintiffs argue that on June 21, 2010, Medeiros submitted Trevor's name to the CACI listing, which they contend was premature and impacted his due process and familial association rights (FAC ¶¶ 39, 41, 66.)

California Penal Code §§ 11164 et seq., the Child Abuse and Neglect Reporting Act, sets forth the standards for reporting child abuse investigative dispositions to CACI. Substantiated dispositions [10] must be reported to the DOJ for inclusion on the CACI. Cal. Penal Code § 11169(a). If an individual wishes to challenge the substantiated disposition, he or she may do so in an administrative due process hearing, with the mandamus writ procedures to review the hearing result if necessary. Id. at § 11169(d). However, a hearing shall be denied where a court of competent jurisdiction has determined the abuse occurred. Id. at § 11169(e).

In Humphries v. Los Angeles County, the Ninth Circuit found that an erroneous listing of parents who are accused of child abuse, but later found to be factually innocent violates the parents' due process rights. 554 F.3d 1170, 1200 (9th Cir. 2009), rev'd in part on other grounds, 562 U.S. 29, 131 S.Ct. 447, 178 L.Ed.2d 460 (2010). The Ninth Circuit specifically found that "[t]he lack of any meaningful, guaranteed procedural safeguards before the initial placement on CACI combined with the lack of any effective process for removal from CACI violates the [parents'] due process rights." Id. The court went on to state that, at the very least, "California must promptly notify a suspected child abuser that his name is on the CACI and provide 'some kind of hearing' by which he can

---

10. A report is "substantiated" if the investigator who conducted the investigation to constitute child abuse or neglect, finds that the evidence that makes it more likely than not that child abuse or neglect occurred. Cal. Penal Code § 11165.12. A report is not "substantiated" if the investigator who conducted the investigation found the report to be false, inherently improbable, to involve an accidental injury, or to not constitute child abuse or neglect. Cal. Penal Code § 11165.12.

challenge his inclusion." Id. at 1201. After Humphries, California amended the Reporting Act to provide for a hearing process. See Cal. Penal Code § 11169(d); see also Mann v. Cnty. of San Diego, No. 3:11-CV-0708-GPC-BGS, 2013 WL 4046642 (S.D. Cal. Aug. 8, 2013).

██ Medeiros and Zetmeir argue that Medeiros filled out the form to have Trevor listed on the CACI, but the process was never completed. (Doc. No. 52–1, p. 11.) County also contends that "although a form was filled out with the intent to list Mr. Reynolds on the index, it was never sent to the state and he was never listed on the index." (Doc. No. 55–1, p. 9.)

At this juncture, the burden shifts to the Plaintiffs to set forth specific facts to show that Trevor's name was placed or listed on the CACI. Anderson, 477 U.S. at 256, 106 S.Ct. 2505. Bald assertions or conclusory statements are insufficient. Schneider, 938 F.2d at 990–91. In response, Plaintiffs fail to make a showing to suggest a material issue of fact is in dispute. Until Trevor's name is placed on the CACI, no due process hearing is triggered. As such, the Court finds that no genuine issues of material fact exist to be resolved at a trial.

### 2. Clearly Established Right

Under Humphries, it is clear that an erroneous listing of parents who were accused of child abuse on the CACI without notice and an opportunity to be heard would violate the parents' due process rights. Thus, the current law at the time of the events in this case would place a reasonable social worker on notice of Trevor's due process rights. 554 F.3d at 1200.

Even though the right is clearly established, Plaintiffs have not shown that Defendants Medeiros and Zetmeir violated the right. The record only indicates that Defendant Medeiros filled out the document required for placing Trevor on the

Department of Justice CACI list. Completion of the CACI form was reasonable in light of the treating physician's and child abuse expert's suspicion of non-accidental trauma during the time Trevor was supervising her children. Defendant Medeiros addresses the CACI listing allegations in her motion for summary judgment, but Plaintiffs do not address the claim in its opposition. For that reason, the Court finds Plaintiffs have implicitly withdrawn its section 1983 claim on this ground. Notwithstanding, the evidence does not present a genuine issue of material fact and Defendant Medeiros' motion for summary judgment, as to qualified immunity from claims stemming from the CACI listing allegations, is GRANTED.

### e. County of San Diego's Qualified Immunity Claim

Defendant County asserts that its employees are protected by qualified immunity. (Doc. No. 55–1, pp. 7–8.) Specifically, the County claims it cannot be liable for R.R. and H.R.'s medical examination as the services were provided by Kaiser Hospital and Rady Children's Hospital, respectively. (Doc. No. 55–1, p. 7.) Also, County contends qualified immunity shields it from liability for the initial medical screenings as they did not violate a clearly established right and it was not unreasonable to comply with the a general order to conduct such examinations. (Doc. No. 55–1, p. 8.)

██ To establish municipal liability under § 1983, a plaintiff must show "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." Mendiola–Martinez v. Arpaio, 836 F.3d 1239, 1248 (9th Cir. 2016) (quoting City of Canton v. Harris, 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). "The language of Wallis is clear and unambiguous: government officials cannot exclude parents entirely from the

location of their child's physical examination absent parental consent, some legitimate basis for exclusion, or an emergency requiring immediate medical attention." Greene v. Camreta, 588 F.3d 1011, 1037 (9th Cir. 2009), vacated in part on other grounds by Greene v. Camreta, 661 F.3d 1201 (9th Cir. 2011).

█ The record is clear that Defendant County had a policy that parents of children undergoing medical exams at Polinsky are not given notice of said exams, nor are they allowed to be present for the exams, nor does the County seek court order for such exams. (Doc. No. 66, pp. 61, 66.) Thus, County of San Diego's policy directly caused Plaintiffs' constitutional deprivations here. As such, a reasonable official would be aware that performing a medical examination on H.R. without parental consent or exigent circumstances would be unlawful. Accordingly, qualified immunity does not bar a section 1983 claim against the County for examining H.R. without parental consent (discussed under Monell claims, infra) and absent exigency. Therefore, the County's motion for summary judgment on both issues are DENIED.

## II. State Law Statutory Immunity (First, Second, Third, Sixth, Seventh, Eighth Causes of Action)

### A. Applicability of California Government Code § 820.2

Bryson, Medeiros, and Zetmeir assert they are entitled to discretionary immunity pursuant to California Government Code § 820.2 with respect to the first, second, third, sixth, seventh and eighth causes of actions. (Doc. Nos. 49–1, pp. 25–30; 52–1, pp. 28–31.) Bryson, Medeiros, and Zetmeir further argue that Plaintiffs have not presented evidence to show that the exception to discretionary immunity, California Government Code § 820.21, should apply. (Doc. Nos. 49–1, pp. 29–30; 52–1, p. 31.)

In opposition, Plaintiffs argue Bryson, Medeiros, and Zetmeir are not entitled to discretionary immunity because their conduct falls under § 820.21. (Doc. Nos. 78, pp. 20–22; 79, pp. 24–25.) Specifically, Plaintiffs contend that genuine issues of material fact exists as to whether Bryson, Medeiros, and Zetmeir have failed to conduct a proper investigation, have fabricated evidence, failed to provide exculpatory evidence, and displayed coercive and intimidating conduct during their investigation. (Id.)

In reply, Bryson, Medeiros and Zetmeir continue to assert that § 820.21 does not apply because Plaintiffs have failed to provide sufficient facts to show Defendants conduct falls outside immunity. (Doc. Nos. 96, p. 9; 97, p. 10.)

"Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused." Cal. Gov. Code § 820.2. California Government Code § 820.21 provides that immunity for social workers does not extend to conduct that includes perjury, fabrication of evidence, failure to disclose exculpatory evidence and obtaining testimony by duress, if committed with malice. Malice is conduct intended to cause injury or despicable conduct that is carried on with a "willful and conscious disregard of the rights or safety of others." Cal. Gov. Code § 820.21(b). "A public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, even if he acts maliciously and without probable cause." Cal. Gov. Code § 821.6.

Here, Defendants' conduct in removing R.R. and H.R. from their parents, detaining them, and reporting to the juvenile court judge were performed within the scope of their duties as social workers investigating the allegations of abuse and prosecuting the dependency action. Accordingly, they are entitled to statutory immunity unless the exception of California Government Code § 820.21 applies.

Plaintiffs contend that Defendants used false and fabricated evidence and testimony, and failed to provide exculpatory evidence, during the investigation and pendency of the dependency proceedings. Specifically, Plaintiffs' allege Bryson falsely reported she was told by Dr. Newton that R.R.'s injury was a result of non-accidental trauma. (Complaint ¶ 28.) Plaintiffs argue Defendants Medeiros and Zetmeir, aware of the false information in the report, filed the dependency petition anyway. Plaintiffs also contend Medeiros failed to provide Dr. Nunes' report regarding brittle bone disease at the Settlement Conference on July 28, 2010.

Defendants' argue Plaintiffs' claim fails because Bryson accurately conveyed the substance of the conversation she had with Dr. Newton (Doc. No. 49–1, pp. 29–30) and nonetheless, his medical notes were attached to the Detention Report along with a letter dated June 11, 2010 from Dr. Kaufhold. (Doc. No. 72–2.) Defendants contend Bryson's report was truthful and not fabricated. Defendants further argue that all of the parties and counsel discussed Dr. Nunes' report at the settlement conference hearing, and at the same hearing, all parties agreed to continue the matter to August 18, 2010. (Doc. No. 52–1, p. 21–22.) ▪ As discussed above, Plaintiffs have not set forth sufficient facts demonstrating a genuine issue as to whether Defendants engaged in perjury, fabrication of evidence, failure to disclose exculpatory evidence or obtaining testimony by coercion or intimidation. Moreover, Plaintiffs fail to set forth any evidence that Defendants Bryson, Medeiros, and Zetmeir's conduct was committed with malice. Accordingly, section 820.21 does not apply to Defendants conduct and they are entitled to immunity. Therefore, Defendants' motion for summary judgment on this issue is GRANTED.

B. Applicability of California Civil Code § 47

Defendants Bryson, Medeiros, and Zetmeir argue their conduct is privileged pursuant to California Civil Code § 47 and, therefore, they are immunized from tort liability. (Doc. No. 49–1, pp. 26–28; 52–1, pp. 29–31.) In opposition, Plaintiffs cite to Parkes and argue that California Civil Code § 47 does not immunize tortious conduct. (Doc. Nos. 78, p. 22; 79, p. 25.) Specifically, Plaintiffs argue section 820.21 explicitly removes the immunity of social workers, "notwithstanding any other provision of law." (Id.)

Because the Court has already determined that Defendants are entitled to discretionary immunity pursuant to § 820.2 for the same claims, this Court will not address whether Defendants' conduct is protected by the litigation privilege.

III. State Law Claims (Third, Seventh, Eighth Causes of Action)

Bryson, Medeiros, and Zetmeir argue that Plaintiffs cannot maintain a cause of action under California Civil Code § 52.1 because no threats of violence were made against Plaintiff. (Doc. Nos. 49–1, p. 22; 52–1, p. 33.) Additionally, Bryson cites to Venegas v. County of Los Angeles, 153 Cal.App.4th 1230, 1242, 63 Cal.Rptr.3d 741 (2007), and argues that public entities cannot be sued under California Civil Code § 52.1. (Doc. No. 49–1, p. 31.) In opposi-

tion, Plaintiffs argue that California Civil Code § 52.1 does not require them to make a showing of discriminatory animus. (Doc. No. 79, p. 29.) Plaintiffs further argue that the evidence shows that Bryson violated Plaintiffs' rights by detaining R.R. and H.R. and coercing Trevor and Heather to leave the hospital. (Doc. No. 78, p. 26.) In addition, Plaintiffs argue that the evidence shows the Medeiros and Zetmeir violated Plaintiffs' rights by continuing to detain R.R. and H.R. and by trying to coerce Plaintiffs into admitting abuse when none occurred. (Doc. No. 79, p. 29.)

With respect to the individual defendants, this Court will not addresses Defendants arguments as this Court has already determined that Defendants are entitled to discretionary immunity for the same claims.

 With respect to the claims asserted against County, this Courts finds that Venegas v. County of Los Angeles does not prohibit suit against County under California Civil Code § 52.1. Defendant County's motion for summary judgment on this basis is DENIED.

## IV. Monell Claims (Fifth Cause of Action)

Defendant County moves for summary judgment as to all of Plaintiff's Monell claims. (Doc. No. 55–1, pp. 8–10.) Plaintiffs contend County's established policies and procedures violated Plaintiffs' First, Fourth, and Fourteenth Amendment rights. (Doc. No. 77, pp. 21–27.) The Court will only address the following Monell claims set forth in Plaintiffs' opposition[11]: In opposition, Plaintiffs contend the evidence demonstrates the County has the following policies:

A. Excluding Parental Presence at Medical Procedures;

B. Drug Testing Children at Polinsky Children's Center;

C. Examining Children at Polinsky Without Court Order, Parental Consent, Preservation of Evidence, or Urgent Medical Need;

D. Removing Children Without a Reasonable Belief of Imminent Danger of Serious Bodily Injury;

E. Continued Detention of Children When There is No Urgent Necessity For Their Continued Detention;

F. Failing to Conduct A Proper Investigation of Abuse;

G. Providing False Testimony and Failing to Provide Exculpatory Evidence in Court Reports; and

H. Using Duress, Coercion and Undue Influence During a Child Abuse Investigation.

(Doc. No. 77, pp. 21–27.)

Plaintiffs also move for summary judgment against County on the following issues: (1) County's Policy of Forbidding Parents from Attending Their Child's Examination and Testing at Polinsky Violates the Parents' and H.R.'s Constitutional Rights; (2) The Physical Examination and Testing of H.R. in the Absence of Probable Cause, Court Order, or Exigency Violated the Constitutional Rights of the Plaintiffs; and (3) The 2007 Order Authorizing Health Assessments is Unconstitutional as a General Warrant. These issues will be addressed in turn.

 A municipality may be held liable for violations of civil rights caused by a policy or practice. Monell v. New York City Dept. of Social Svcs., 436 U.S. 658, 98

---

11. Because Plaintiffs only respond to and oppose summary judgment on the eight County policies referred to herein, the Court

GRANTS the County's motion for summary judgment as to all other Monell claims.

S.Ct. 2018, 56 L.Ed.2d 611 (1978). In order to avoid summary judgment, a plaintiff need only show that there is a question of fact regarding whether there is a city custom or policy that caused a constitutional deprivation. Wallis, 202 F.3d at 1135. To establish liability, the plaintiffs must show that (1) they were deprived of a constitutional right; (2) the County had a policy; (3) the policy amounted to a deliberate indifference to the constitutional right; and (4) the policy was the "moving force behind the constitutional violation." Mabe 237 F.3d at 1110–11 (citing Van Ort v. Estate of Stanewich, 92 F.3d 831, 835 (9th Cir.1996)).

### A. Medical Examinations Without Parental Presence (County's Alleged Policies (A))

1. Deprivation of a Constitutional Right

"The language of Wallis is clear and unambiguous: government officials cannot exclude parents entirely from the location of their child's physical examination absent parental consent, some legitimate basis for exclusion, or an emergency requiring immediate medical attention." Greene v. Camreta, 588 F.3d 1011 (citing Wallis, at 1141–42.)

 In the instant case, County argues there are several good reasons why parents are not allowed in the exam room. (Doc. No. 55–1, p. 7.) In support of their reasons, County offers the declarations of Dr. Wright and Norma Rincon, which state that parents are excluded because: (1) the exams are conducted in the medical clinic located in a confidential area of the center; (2) the presence of an offending parent or a parent supportive of an offending parent can negatively affect the exam; (3) the exams are brief, lasting 10–20 minutes; (4) the staff created an upbeat, light, and playful atmosphere during the exams, and the exams are very rarely upsetting to

the child; (5) the doctors are available during a limited time frame to conduct the exams; and (6) there would be practical difficulties as well as the potential for parents to manipulate the exams to hide abuse if the staff had to attempt to locate parents and schedule their presence. (Doc. Nos. 55–1, p. 7; 98, pp. 5–6.)

 But even if County's reasons are legitimate and valid to justify exclusion (which this Court need not address), their reasons alone cannot justify the County's actions in the instant case. Under Wallis,

> parents have a right arising from the liberty interest in family association to be with their children while they are receiving medical attention (or to be in a waiting room or other nearby area if there is a valid reason for excluding them while all or a part of the medical procedure is being conducted). Likewise, children have a corresponding right to the love, comfort, and reassurance of their parents while they are undergoing medical procedures, including examinations-particularly those, such as here, that are invasive or upsetting. The interest in family association is particularly compelling at such times ... in part because of the family's right to be together during such difficult and often traumatic events.

Wallis, 202 F.3d at 1142. Here, it is undisputed that Trevor and Heather Reynolds were not allowed "to be in a waiting room or other nearby area" at Polinksy while the examinations were being conducted. (Doc. No. 58–11, p. 7.) Thus, even if the parents could be excluded from the examination room, the parents could not have been excluded from a nearby waiting area.

Defendants attempt to persuade this Court that Wallis and Greene are distinguishable from the instant case. Specifically, Defendants contend "the Polinsky

exams are different" than the "extensive forensic investigatory exams described in Greene and Wallis." (Doc. No. 98, p. 6.) Defendants go on to argue that:

the exams of children at Polinsky take a much shorter time (10–20 minutes), do not involve the use of a magnifying scope, photographs of the genitals, or evidence collection, and are conducted for the primary purpose of ensuring the health and wellness of the children being examined and the other children at the center. While the medical staff at Polinsky will note the findings of the exam and take photos of injuries that are consistent with abuse, the primary purpose of the exams is the health and welfare of the children.

(Doc. No. 98, p. 2–3)(internal citations omitted). H.R.'s examining doctor, Dr. Graff, testified that all children brought to Polinksy are subjected to these exams which are conducted, in part, to investigate and look for evidence of abuse. (Doc. No. 86–7, Dr. Graff's Depo. at 22:19–23:11; 51:3–14.) Evidence is documented on a graph and photographed. Id.

In Wallis, an "evidentiary physical examination" was given to two children in order to determine whether either child had been sexually abused. 202 F.3d at 1135. The medical procedures included internal body cavity examinations of the children, vaginal and anal, and the doctor conducting the examinations took photographs of both the inside and outside of one child's vagina and other child's rectum. Id.

In Greene, a child "was told to undress" and the person conducting the exam "looked all over [her] body," "took pictures of [her] private parts," and used a magnifying glass scope to visually examine her." 588 F.3d at 1119. The KIDS Center who conducted the examination specialized in child sexual abuse and the exam was given to check for signs of sexual abuse. Greene, 588 F.3d at 1118–19.

County's attempt to distinguish Wallis and Greene is unpersuasive. To begin with, "the exams in Greene were also referred to as 'assessments,' not 'forensic investigatory' exams as the County contends. Swartwood, 84 F.Supp.3d at 1118 (citations omitted). More importantly, the description of the assessment in Greene establishes that it was similar to the County's exams." (Id.) Indeed, like the exams in Greene, County admits that the Polinksy exams involve taking photos and the use of a magnifying glass. (Doc. No. 98, p. 2–3.) Moreover, it is hard to imagine that a child's "right to the love ... of their parents" at a medical examination is not usurped simply because a doctor takes photographs of their injuries for the purpose of the "health and welfare of the children" rather than to investigate signs of child abuse. Wallis, 202 F.3d at 1142. Although Defendants argue the primary purpose of the exam is for "health and welfare of the children," the record evidences that another purpose of the exam is to "investigate whether or not child abuse or neglect did in fact occur." (See Doc. No. 86–7, Graff's Depo. at 51:3–14.)

For these reasons, the holdings in Wallis and Greene are applicable to the instant case. Trevor, Heather, and H.R.'s constitutional rights were violated when the parents were not allowed to be present in the examination room, or an adjoining room, at H.R.'s medical examinations, unless the County can prove a legitimate basis for exclusion or an emergency requiring immediate medical attention. Greene, 588 F.3d at 1011. On the facts here, there is a genuine issue of material fact as to the application of an exception. Thus, the County's motion for summary judgment on this issue is DENIED.

### 2. Deliberate Indifference/Policy as Moving Force Behind Violation

County argues that it was not deliberately indifferent to Plaintiffs' rights because a court order, state law, and two federal district court cases have all supported County's policies and practices. (Doc. Nos. 55–1, p. 10; 98, pp. 6–8.) In response, Plaintiffs' argue that County's policy of excluding parents from medical procedures has been unlawful since 2000 under Wallis, and the County has still refused to make changes to this policy. (Doc. No. 77, p. 19.)

Here, Plaintiffs have presented evidence from which it may reasonably be inferred that all parents are excluded from their children's medical exams at Polinksy. H.R.'s examining doctor, Dr. Graff, has testified that parents, including non-offending parents, were forbidden to attend their child's examination at Polinsky from 1994 through 2011 (when she left as medical director). (See Doc. No. 86–7, Graff's Depo. at 110:5–22; 115:11–23; Doc. No. 87–18, Wright's Depo. at 37:4–12.) Dr. Graff has also testified that prior to the examination occurring, Polinsky does not notify parents that an examination is going to be conducted on their children. (See Doc. No. 86–7, Graff's Depo. at 115:11–23.)

Accordingly, a genuine issue of material fact exists as to whether the moving force behind the exclusion of Trevor and Heather at the medical examinations of their children was County's policy excluding them. Defendant County fails to show it is entitled to judgment as a matter of law as questions remain about whether County's application of the policy amounts to deliberate indifference to Plaintiffs' constitutional rights. For these reasons, County's motion for summary judgment as to this issue is DENIED.

### B. Medical Examinations Without Parental Consent, Court Order, Urgent Medical Need [12] (County's Alleged Policies (B) & (C))

County argues the medical exams of H.R. did not cause a constitutional violation because Heather consented to the exams, the County was authorized by Court order to undertake the exams, and the examination of R.R. was conducted pursuant to California Welfare and Institutions Code § 324.5.

### 1. Consent

County argues a constitutional right was not violated because Heather signed a consent form on June 9, 2010 authorizing the examinations of H.R. (Doc. Nos. 55–1, p. 4; 89–12; 98, p. 5.) Plaintiffs argue (1) the consent is invalid because the mother signed the forms under duress, and (2) the consent form is invalid. (Doc. No. 77, p. 17.)) In support of their proposition, Plaintiffs cite to Heather's declaration, where she states:

> "[B]efore we were escorted from the hospital at approximately midnight on June 9, 2010, I signed a form presented to me by B[ryson] who stated that it was a form to sign in case H.R. needed medical treatment. That form stated that "routine admission and placement examinations, including blood test, immunization, and cervical cultures" could be provided "when indicated." At the time I signed this, I knew that H.R. was current on his immunizations and that neither a physical examination, blood test, nor a urine screen were indicated."

(Doc. No. 58–11.)

First, Plaintiffs contend that "the form was signed by mother while under duress

---

**12.** Polinsky's medical examinations often include drug testing, such that the discussion of County's alleged policy regarding drug testing is related to the discussion of medical examinations and is included here.

and undue influence when told her children were removed from her care." (Doc. No. 77, p. 17.) Plaintiffs fail to present a genuine issue of material fact pointing to duress and undue influence. Accordingly, this Court finds that Heather's conclusory allegation relating to signing the consent form under duress and undue influence is unpersuasive.

Second, Plaintiffs argue the consent form itself is misleading because the form allows treatment if recommended. (Doc. No. 77, p. 17.) The consent form, signed by Heather, authorized a medical examination of H.R. "if the treatment is recommended by a licensed physician, dentist, psychiatrist or other mental health practitioner." (Doc. 89–12, p. 2.) On the form, Heather also indicated that she preferred treatment by a private physician, but "[i]f private treatment . . . cannot, for any reason, be performed she authorized "treatment at a licensed hospital/medical facility." In essence, Heather argues any consent given was subject to limitations or conditions. (Id.) As stated in her declaration, Heather believed "neither a physical examination, blood test, nor a urine screen were indicated" because "H.R. was current on his immunizations." (Doc. No. 58–11.) Moreover, the form and the word "treatment" does not cover children's drug testing.

Here, the record does not establish that a physician specifically recommended that H.R. should undergo treatment. Plaintiffs have presented evidence that H.R.'s private physician was not contacted, prior to examining H.R. at Polinsky. There are genuine issues of material fact concerning whether the consent form is misleading, and whether the County exceeded the scope of Heather's consent. Also, Defendant County is not entitled to judgment as a matter of law as the continued use of the consent form raises a question of whether the following of the County policy constitutes a deliberately indifference to Plaintiffs' Fourth and Fourteenth Amendment rights. See Swartwood, 84 F.Supp.3d at 1124 (finding that the same consent forms at issue here are misleading and did not notify parents that their children would be subjected to mandatory medical assessments); see also Dennis v. DeJong, 867 F.Supp.2d 588, 656 (quoting that a municipality's "policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision" by the municipality to "violate the Constitution." Connick v. Thompson, 563 U.S. 51, 131 S.Ct. 1350, 1360, 179 L.Ed.2d 417 (2011)). For these reasons, County's motion for summary judgment as to this issue is DENIED.

### 2. Juvenile Court 2007 Order

County contends they were authorized to undertake medical examinations pursuant to the January 8, 2007 Order "Authorizing Health Assessments and Immunizations Prior to Detention Hearing and Release of Information Concerning Care Provided Pursuant to this Order" (the "2007 Order"). (Doc. No. 55–15, pp. 2–3.)

Plaintiffs argue the 2007 Order is unconstitutional because it describes neither "the place to be searched" nor the "person or things to be seized" and its primary purpose is to investigate the crime of child abuse in violation of the Fourth Amendment. (Doc. No. 77, p. 15.) Plaintiffs also argue that the 2007 Order is unconstitutional as applied because the Order states HHSA "may" obtain a comprehensive health care assessment "as necessary," which is contrary to the mandatory examination that was conducted on H.R. (Doc. No. 77, p. 16.)

The 2007 Order states in relevant part that:

Pursuant to Welfare and Institutions Code ("WIC") sections 305, 306, 324.5, 369, and 361.2(e), in situations where (1)

a child is in the custody of the Health and Human Services Agency ("HHSA") of the County of San Diego and (2) no detention hearing has taken place... HHSA may obtain a comprehensive health assessment as recommended by the American Academy of Pediatrics ... for a child prior to the detention hearing in order to ensure the health, safety, and well-being of the child. The assessment may include ... as is necessary and appropriate to meet the child's needs ... a physical examination by a licensed medical practitioner ... [and] clinical laboratory tests or X-rays as deemed necessary.

(Doc. No. 55–15, pp. 2–3.)

As noted above, the 2007 Order authorizes "comprehensive health assessment as recommended by the American Academy of Pediatrics." (Doc. No. 55–15, p. 2.) Regarding comprehensive health assessments, American Academy of Pediatrics (AAP) notes the following:

a comprehensive health assessment should be performed by a pediatrician who is knowledgeable about, and interested in, the treatment of children in foster care ... Time permitting, it may be possible to do the screening and comprehensive assessments simultaneously ... The child's caseworker and foster parents should be present for the initial visit ...When appropriate ... birth parents should be encouraged to be present at health care visits and to participate in health care decisions ...The physical examination should focus on the presence of any acute or chronic medical problems ... Laboratory tests for these conditions [HIV infection, hepatitis, and other sexually transmitted infections] should be performed when appropriate.

(AAP, Doc. No. 55–15, p. 7.)

The text of AAP regarding comprehensive health assessments also contemplates parental presence at the exams, but neither Trevor nor Heather was permitted to be present at their children's exams. The 2007 Order is predicated in part upon compliance with AAP's recommendations notes that "foster parents should be present for the initial visit" and "birth parents should be encouraged to be present at health care visits." (Doc. No. 55–15, p. 7.) The undisputed evidence establishes that neither Trevor nor Heather were notified of the exams, let alone encouraged to attend the exams. See Wallis, 202 F.3d at 1142 ("parents have a right ... to be with their children while they are receiving medical attention ... [and] children have a corresponding right to the love, comfort, and reassurance of their parents while they are undergoing medical procedures.") Accordingly, the 2007 Order is insufficient to authorize the medical exams of R.R. and H.R. without their parent's notification or presence.

 Parental consent is unnecessary if "a judicial officer has determined, upon notice to the parents, and an opportunity to be heard, that grounds for such an examination exist and that the administration of the procedure is reasonable under all the circumstances". See Wallis, 202 F.3d at 1141; see also Swartwood, 84 F.Supp.3d at 1121 (finding the 2007 Order is insufficient to authorize medical examination absent parental consent.) More importantly, requiring someone to submit to a medical examination invades an expectation of privacy that "society is prepared to consider reasonable," and thus clearly implicates the Fourth Amendment. Yin v. State of Cal., 95 F.3d 864, 870 (9th Cir. 1996) (internal citation omitted). The Supreme Court has previously held that blood tests, urinalysis, and breathalyzer tests are searches implicating Fourth Amendment rights. Schmerber v. Califor-

*nia,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

For these reasons, this Court finds that the 2007 Order did not authorize H.R.'s examinations to occur as undertaken in this case.

It is also undisputed that H.R. was examined at least twice at Polinsky. The Polinsky examinations include a urine drug screening, physical examination, along with PPD and Hemoglobin testing. Under Parkes and Yin, H.R. has a legitimate expectation of privacy in not being subjected to these medical examinations without his parents' consent. The 2007 Order was the moving force behind County's justification that Polinsky doctors could examine H.R. without parental authorization. As a matter of law, County's continued justification relying on the 2007 Order and lack of training for Polinsky employees, in the face of countervailing case law, amounts to deliberate indifference to the rights of juveniles, such as H.R., which Polinsky doctors examine without probable cause, court order, or exigent circumstances. Therefore, the Plaintiffs' motion for summary judgment is GRANTED in relation to the H.R.'s physical examination absent probable cause, court order, or exigency.[13] Consequently, Defendant County's motion for summary judgment on this issue is DENIED.

### 3. California Welfare and Institutions Code § 324.5

#### a. Deprivation a Constitutional Right

Defendants contend "the examination of R.R. was explicitly authorized by Welfare and Institutions Code section 324.5," which authorized examinations when a child is taken into custody based on allegations of physical abuse." (Doc. No. 55–1, p. 5.) Section 324.5 states in relevant part that:

> Whenever allegations of physical or sexual abuse of a child come to the attention of a local law enforcement agency or the local child welfare department and the child is taken into protective custody ... the [agency] may, as soon as practically possible, consult with a medical practitioner, who has specialized training in detecting and treating child abuse injuries and neglect, to determine whether a physical examination of the child is appropriate. If deemed appropriate, the [agency], or the child welfare department, shall cause the child to undergo a physical examination performed by a medical practitioner who has specialized training in detecting and treating child abuse injuries and neglect

Section 324.5(a).

In Wallis, the Ninth Circuit noted that there was no conflict between Section 324.5 and other law necessitating parental notice and informed consent.[14] 202 F.3d at 1141 n.12. See Swartwood, 84 F.Supp.3d at 1122 (S.D. Cal. 2014)(finding Section 324.5 does not authorize medical examinations absent parental notice or consent).

Similarly, this Court also fails to see any conflict between Wallis's requirements and Section 324.5. As such, even though Section 324.5 authorizes medical examinations, the Section does not authorize the examination absent parental notice.

#### b. Policy as Moving Force Behind Violation

To avoid summary judgment, the Plaintiffs need to establish a question of fact

---

**13.** In light of the Court's reasoning, it need not decide whether the 2007 Order is constitutional.

**14.** However, because the medical exams at issue in Wallis occurred seven years before the statute was enacted, the Ninth Circuit did not decide "whether or to what extent the law is affected by our decision here." Id., 202 F.3d at 1141 n. 12.

exists as to whether County has a policy that caused H.R. to undergo medical examinations without court order, parental consent, preservation of evidence, or urgent medical need.

Here, Plaintiffs have presented evidence from which it may reasonably be inferred that all parents do not provide consent or receive notice of their children's medical exams at Polinksy. H.R.'s examining doctor, Dr. Graff, testified that parental consent is not needed to conduct a physical examination at Polinsky because the 2007 Order authorizes physical examinations without any limitations. (See Doc. No. 86–7, Graff's Depo. at 43:2–22.) She states that all children brought to Polinsky are subjected to these exams which are conducted to investigate and look for evidence of abuse. (See Doc. No. 86–7, Graff's Depo. at 22:19–23:11; 51:3–14.) Evidence is documented on a graph and photographed. (See Doc. No. 86–7, Graff's Depo. at 22:19–23:11) In her deposition, Dr. Graff further testified that the same medical exam of children admitted to PCC from 1994 to 2011 was given to all children under age eight, regardless of the nature of abuse alleged. (See Doc. No. 86–7, Graff's Depo. at 35:3–7; 35:23—36:19.)

Accordingly, Defendant County fails to establish that it is entitled judgment as a matter of law as to its' practice of using the Consent Form and performing examination on all children, whether or not it is "necessary and appropriate to meet the child's needs." For these reasons, Defendant County's motion for summary judgment as to this issue is DENIED.

#### 4. Plaintiffs' Motion for Summary Judgment

Based on the same arguments discussed above, Plaintiffs also move for summary judgment against County on the following issues: (1) County's Policy of Forbidding Parents from Attending Their Child's Examination and Testing at Polinsky Violates the Parents' and H.R.'s Constitutional Rights; (2) The Physical Examination and Testing of H.R. in the Absence of Probable Cause, Court Order, or Exigency Violated the Constitutional Rights of the Plaintiffs; and (3) The 2007 Order Authorizing Health Assessments violates Plaintiffs' constitutional rights. For the reasons discussed above, Plaintiffs' motion for partial summary judgment is GRANTED as to all three issues.

#### C. Removal And Continued Detention Absent Imminent Danger & Failure to Conduct Proper Investigation of Abuse (County's Alleged Policies (D), (E) & (F))

#### 1. Deprivation of a Constitutional Right

In opposition to County's motion, Plaintiffs' argue Defendants' failure to properly investigate allegations of child abuse against R.R. resulted in a hurried finding that exigency existed to remove or to continue to detain the children.

As discussed above, no genuine issue of material fact exist as to whether there was reasonable cause to believe, on the basis of the information in the possession of the social workers, that R.R. faced an immediate threat of serious physical injury or death even if left with Heather, and whether the actions taken by social workers exceeded the permissible scope of the action necessary to protect R.R. from that immediate threat.

However, H.R.'s Fourth and his parents' Fourteenth Amendment right were deprived when H.R. was removed from his grandmother's home absent exigent circumstances and a failure to conduct any investigation.

#### 2. Policy as Moving Force Behind Violation

The record is clear, here, that the County has a policy that allowed the removal of

H.R. absent exigent circumstances. As discussed above, H.R. was removed from his grandmother's home absent exigent circumstances and without a reasonable investigation. For that reason, the Court finds the County's policy is the moving force behind Plaintiffs' deprivation of constitutional rights as to the removal of H.R. Plaintiffs adduce evidence that the County's policy was deliberately indifferent to their right. The Court finds the County's application of this policy demonstrates the County's deliberate indifference to Plaintiffs' constitutional rights as a matter of law. Accordingly, Defendants' motion is DENIED as to this policy.

D. Providing False Testimony & Using Duress During an Investigation (County's Alleged Policies (F) & (H))

1. Deprivation of a Constitutional Right

This Court has found that Plaintiffs have not presented evidence that County has provided false testimony or has failed to provide exculpatory evidence in court reports. Nor have Plaintiffs presented evidence that County used duress, coercion, or undue influence during a child abuse investigation. Thus, Plaintiffs have not shown that a deprivation of their constitutional right has occurred.

2. Policy as Moving Force Behind Violation

Viewing facts in the light most favorable to Plaintiffs, it cannot be said that the County had a policy of permitting the presentment of false testimony and using duress during child abuse investigations. The evidence establishes that the "County's policies do not support artificially creating dependency, making threats or providing false testimony." (Doc. No. 55–2, pp. 4–5.) Specifically, Defendants argue misrepresenting facts, unnecessary detention and dependency, withholding exculpatory

information, and threatening families are contrary to County policy. (Doc. No. 55–1, pp. 9–10.)

Plaintiffs have not shown that County had a policy to provide false testimony or use duress during child abuse investigations. There is no genuine issue of material fact on this issue. Thus, Defendant County's motion for summary judgment, as to the Monell claim for providing false testimony and using undue influence in the investigation, is GRANTED.

### CONCLUSION AND ORDER

IT IS HEREBY ORDERED Defendant Bryson's motion for summary judgment [doc. no. 49] is GRANTED IN PART AND DENIED IN PART as follows:

1. The motion is GRANTED as to the following:

A. Bryson's individualized consideration on the motion for summary judgment;

B. Exigent circumstances justified R.R.'s removal from her parents prior judicial authorization;

C. Notwithstanding exigent circumstances, Defendants Bryson and Berglund are entitled to qualified immunity as to R.R.'s initial removal;

D. Defendants Bryson and Berglund are entitled to discretionary immunity under Cal. Gov. Code § 820.2 as to the First, Second, Third, Sixth, Seventh, and Eighth cause of action; and

E. Defendants Bryson and Berglund did not incur punitive damages liability.

2. The motion is DENIED as to the following:

A. Exigent circumstances did not justify removing H.R. from Howland's home; and

B. Qualified immunity does not bar Plaintiffs' section 1983 claim against Defendants Bryson and Berglund for their decision to remove H.R. from Howland's home.

IT IS ALSO ORDERED Defendants Medeiros and Zetmeir's motion for summary judgment [doc. no. 52] is GRANTED IN ITS ENTIRETY.

IT IS FURTHER ORDERED Defendant County of San Diego's motion for summary judgment [doc. no. 55] is GRANTED IN PART AND DENIED IN PART.

IT IS HEREBY ORDERED Plaintiffs' motion for summary judgment [doc. no. 58] is GRANTED IN ITS ENTIRETY.