Filed 12/23/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CASEY N., | |
| Plaintiff and Respondent, | G059917 |
| v. | (Super. Ct. No. 30-2011-00467326) |
| COUNTY OF ORANGE et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeal from a judgment and postjudgment orders of the Superior Court of Orange County, Craig L. Griffin, Judge. Affirmed.

Woodruff, Spradlin & Smart, Daniel K. Spradlin, Jeanne L. Tollison, and Roberta A. Kraus for Defendants and Appellants.

The Lanier Law Firm, Michael Akselrud, Rebecca Phillips; Messing & Spector, Noah A. Messing and Phillip M. Spector for Plaintiff and Respondent.

INTRODUCTION

Casey N. (Casey) sued the County of Orange (the County) and two employees of the County's Social Services Agency (the Agency) for violating her civil

rights in connection with a dependency proceeding involving Casey's minor child. A jury found in Casey's favor and awarded her damages. The County and its employees appealed; we affirm.

First, we conclude the trial court did not err by failing to determine the materiality of allegedly fabricated or misrepresented evidence or omitted exculpatory evidence before giving the case to the jury for deliberation.

Second, we conclude the jury's verdict against the employees was supported by substantial evidence.

Third, we conclude the employees were not entitled to qualified immunity.

Fourth and finally, we conclude the jury's verdict against the County under *Monell v. Department of Social Services of the City of New York* (1978) 436 U.S. 658 (*Monell*) was supported by substantial evidence.

We publish this case for two reasons. First, we reiterate the need for sufficient and appropriate training for all Agency employees. Second, we reinforce the absolute necessity of complete, accurate, and honest reports by the Agency in dependency cases, given the juvenile court's reliance on the knowledge and expertise of the Agency in making its decisions.

FACTUAL BACKGROUND

Casey and Scott P. (Scott) are the parents of E.P. (the minor). During proceedings regarding the dissolution of their marriage in the Orange County family law court, Casey obtained a domestic violence temporary restraining order against Scott, after which he was ordered to participate in an anger management program. Casey and Scott agreed Casey would have sole legal custody of the minor and they would share joint physical custody. Casey was to have primary physical custody, with Scott having monitored visitation until he had completed parenting classes, after which his visitation with the minor would be unmonitored.

2

In September 2007, the then three-year-old minor reported to Casey's new husband that Scott had touched her inside her vagina. A dependency proceeding was initiated in San Bernardino County (where Casey was then living) based on allegations Scott had sexually abused or was at risk of sexually abusing the minor. A social worker recommended the court sustain the petition and the minor be removed from Scott's custody. However, that social worker was replaced immediately before the jurisdiction hearing, and the newly appointed social worker recommended the court dismiss the petition. The San Bernardino County dependency court accepted the new recommendation and dismissed the petition.

The Chandler Arizona Police Department investigated the matter, but closed the case in August 2008 due to lack of evidence. (At that time, Scott lived in Arizona.)

In September 2008, the minor told her teacher about another act of sexual abuse by Scott occurring in a movie theater. In November and December 2008, the minor made statements that Scott had also digitally penetrated her while at an urgent care facility in Arizona where the minor was being treated for a bladder infection. The social worker in San Bernardino County found the allegations to be unfounded and refused to file a new dependency petition; the matter was referred back to the family law court in Orange County.

An Orange County social worker found the sexual abuse report substantiated, and in December 2008 a petition was filed in Orange County dependency court under Welfare and Institutions Code section 300, subdivisions (b) and (d), alleging Scott had sexually abused the minor and Casey could not protect the minor because of the existence of custody and visitation orders from the family law court. At the detention hearing, the dependency court ordered the minor to remain in Casey's custody; social worker Birgitt Walpus was assigned to investigate the matter.

Walpus filed an addendum report in February 2009. In that report, Walpus quoted from Casey's e-mail to Walpus's supervisor. Casey's e-mail claimed, in part, Walpus had said she planned to dismiss the case. Therefore, Walpus had told Casey there was no need to speak with law enforcement, the minor's therapist, teacher, or pediatrician, maternal family members, or the San Bernardino social worker because "speaking with those people would not make any difference in her decision that this [is] not an issue of my child's safety." In the addendum report, Walpus also noted that Casey claimed the minor had said Walpus was romantically involved with Scott; Walpus stated Casey's claim was "baffling."

The addendum report included the following assessments and recommendations by Walpus:

• "The undersigned firmly believes that the child . . . has been subject to emotional abuse by the child's mother . . . ."

• "Once again, this shows that the child's mother, Casey, is trying to keep·the child from seeing her father and is acting in her own interest and denying the child to spend [*sic*] quality time with her father."

• "After the undersigned informed the child's mother of the [potty training] accidents, the child's mother came up with the story that the child . . . had nightmares and wetting of her pants. Her timeline of events is off by one week, and it appears that the nightmares and bedwetting were made up by the child's mother."

• "To put it plain and simple, this is a nasty Family Law case that involves the child . . . and it is the undersigned's opinion that the child's mother is feeding information or coaching information to the child . . . . It is extremely unfortunate that the child's parents cannot put their differences aside for their own child's sake. Both of the parents have displayed an extreme disregard for each other. [¶] Because of the mother's actions, the undersigned is beginning to wonder whether placement of the child with the mother is appropriate. The undersigned is extremely concerned that Social Services will

4

not be able to ensure the child's safety and well being if the child's mother continues to make allegations and giving the child . . . false information and not complying with visitation orders, which continues to have a negative impact on the child's emotional well-being."

In March 2009, Walpus was removed as the assigned social worker, and social worker Minda Herman was assigned to replace her.

In the jurisdiction report filed in April 2009, Herman recommended the court sustain the petition, declare dependency, order family maintenance services to Casey, order an enhancement plan for Scott, and order Evidence Code section 730 evaluations of the minor, Casey, and Scott. Crucially, Herman stated she could not be certain either that the minor had been sexually abused or that she had been coached to disclose sexual abuse, and recommended the dependency petition be amended to allege emotional abuse by Casey. "The undersigned remains highly concerned about the fact that the child believes she has been sexually assaulted by her father and readily discloses her beliefs with minimal to no prompting by adults. In short, although *the undersigned does not believe the minor was, in fact, digitally penetrated* on November 22, 2008 at the Sun Valley Pediatric Urgent Care Center, the minor's persistence provides ample disquiet. *The undersigned cannot state with any certainty that [the minor] has not been sexually abused* in the past and the fact that she continues to disclose that she has been cannot be ignored. *The undersigned cannot state with any certainty that [the minor] has been coached or otherwise influenced to disclose sexual abuse*. Thus, the undersigned believes that a[n Evidence Code section] 730 Evaluation of the child, her mother and father will provide additional and objective insight as to the nature of the sexual abuse allegations in this case and to address the most appropriate venue for visitation. [¶] The undersigned believes *the petition should be amended to reflect the issues stated above* and that the child is in need of the protection of the Court. The undersigned further believes [the minor] is in need of continued therapeutic intervention as are her biological

5

parents to better understand the child's beliefs and how to best deal with them as a unit despite their divorce." (Italics added.)

In May 2009, the Orange County Deputy County Counsel dismissed the Welfare and Institutions Code section 300, subdivisions (b) and (d) counts and the sexual abuse allegations against Scott from the petition, and replaced them with a count under Welfare and Institutions Code section 300, subdivision (c) for emotional damage or endangerment based on allegations Casey had influenced the minor to make unsubstantiated accusations of sexual abuse against Scott, and had provided false or misleading information to those investigating the sexual abuse claims to bolster her own credibility and undermine Scott's credibility. Casey's trial counsel stipulated to the dismissal of the sexual abuse allegations and the filing of the amended petition.

In August 2009, at a jurisdiction hearing, the juvenile court found, by a preponderance of the evidence, Casey had knowingly caused the minor to falsely report she had been sexually abused by Scott and this conduct caused or placed the minor at substantial risk for serious emotional harm.

On the record, the juvenile court acknowledged the significance to its decision of the Agency's findings and recommendations: "In this Court's view, the critical finding that brings the child within the provisions of [Welfare and Institutions Code] section 300(c) is the finding true paragraph C16 which alleges, quote, 'By her actions mother has intentionally or unintentionally influenced the child to continue to make disclosures of sexual abuse that are contradicted and/or cannot be substantiated by credible evidence,' closed quote. [¶] . . . [¶] As a starting point there was no evidence offered at trial sufficient to support a finding that the child was ever sexually molested by her father. This is important because if there was credible evidence that the child had, in fact, been molested, then the mother's actions to encourage and facilitate the child's reporting could be construed as a justifiable attempt to protect the child from further abuse and further would constitute a superseding cause of the child's emotional distress."

6

With respect to the alleged sexual abuse at the urgent care center, the juvenile court noted "there is not a shred of evidence that the incident happened save [the minor]'s report."

The juvenile court explained Casey was "completely without credibility." In contrast, the court found Herman to be completely credible and gave her opinions and recommendations "great weight." The juvenile court found: "Regarding the alleged molestation on November 22, 2008, which was the allegation that initiated the current dependency case before this Court, the Court finds credible and worthy of great weight the opinion of the social worker, Minda Herman, that this event did not occur. The Court found Ms. Herman to be a very credible witness, soft spoken, low key, careful with her responses to questions, and without any apparent bias. [¶] Further, the Court found her rationale and the basis for Ms. Herman's opinion that the sexual abuse did not occur on November 22 articulated in court during her testimony and in the report of April 20, 2009, to be sound and well founded."

After the juvenile court made jurisdictional findings, the Agency requested the minor be removed from Casey's care and placed with Scott until the disposition hearing. The court granted the Agency's request, while acknowledging the change of placement at that stage of the proceedings raised due process issues.

Before the disposition hearing commenced in April 2010, Casey signed a stipulation giving sole legal and physical custody of the minor to Scott, with visitation to Casey. Casey later tried to disavow the stipulation, claiming she was given little time to review it, and she was bullied into signing it under threat of having her parental rights terminated. But on the record in the juvenile court she and her counsel advised the court she had had enough time to review the stipulation and proposed case plan, she had had all of her questions answered, and she was "agreeing to this case plan, as well as the overall disposition of this case freely and voluntarily[.]"

The juvenile court retained jurisdiction of the minor for almost two more years. In February 2012, the juvenile court issued exit orders vesting custody of the minor with Scott, and granting visitation to Casey.

PROCEDURAL HISTORY

In April 2011, Casey sued Herman, Walpus, and the County (collectively defendants) under section 1983 of title 42 of the United States Code (section 1983)[1] for violating her constitutional right to familial association by deceiving the juvenile court into removing the minor from her custody. A first amended complaint, which is the operative complaint, was filed in October 2011.[2]

In June 2014, the trial court granted summary judgment in favor of defendants. Another panel of this court reversed the judgment. (*N[.] v. County of Orange* (June 30, 2017, G050930) 2017 Cal.App.Unpub. Lexis 4565.)

A jury trial was held in February and March 2020. In Phase 1 of the trial, the jury found Walpus and Herman liable under section 1983. In Phase 2, the jury found the County liable under *Monell, supra*, 436 U.S. 658, awarded a total of $1,248,000 in compensatory damages, and awarded punitive damages against Walpus ($5,700) and Herman ($9,500).

Defendants' motions for judgment notwithstanding the verdict (JNOV) and for a new trial were denied. Defendants timely filed a notice of appeal.

---

[1] Section 1983 provides in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ." (42 U.S.C. § 1983.)

[2] Walpus and Herman's supervisors were also named as defendants, but were found not liable by the jury. Other defendants from both Orange County and San Bernardino County were dismissed from the case before trial.

At the time of the trial on the section 1983 claim, the minor was 16 years old. A psychiatrist testifying for Casey during phase 2 of the trial diagnosed the minor with generalized anxiety disorder and enuresis; he also diagnosed Casey with dysthymia,[3] generalized anxiety disorder, and panic disorder without agoraphobia.

Casey testified at the section 1983 trial that beginning in 2018, the minor asked to live with her in Michigan, rather than with Scott in Colorado, and told Casey she was afraid of Scott. In July 2018, during a visit with Casey in Michigan, the minor (who was then 14 years old) refused to return to Colorado, and told Casey that Scott was sexually abusing her. A police report was filed, and a case was opened by Michigan social services. The criminal investigation was transferred to Colorado, the location where the alleged abuse occurred. The matter ended up in the Colorado family court, where Walpus and Herman's reports and the California dependency court's jurisdictional findings were presented. The minor spoke with the Colorado family law judge, who said he believed Casey had "poisoned" the minor, and found Casey lacked credibility.

Scott testified the minor visited Casey in Michigan in July 2018, immediately after Scott, the minor, and the minor's best friend went on a camping trip where all three slept in a single SUV rooftop tent. During the minor's visit to Michigan, Casey e-mailed Scott "[the minor]'s told me some disturbing things, and you can talk to my attorney." Scott only saw the minor once between July 2018 and March 2020.

The minor's videotaped deposition was shown to the jury at the section 1983 trial, but was not transcribed and does not appear in the appellate record. Casey's trial counsel told the jury in opening statements during phase 2 of the trial they would hear that "from the time she was five until she was 14, [the minor] had to live alone with Scott . . . , and you're going to hear from her that he abused her."

---

[3] Dysthymia is chronic intermittent persistent depression.

DISCUSSION

I. *The Trial Court Did Not Err by Allowing the Jury to Determine Materiality.*

A. *Who Decides Materiality at Trial—the Jury or the Court?*

Defendants argue the judgment must be reversed because the trial court erred by permitting the jury to decide the issue of materiality. Materiality is determined by considering whether, but for the dishonest or misleading statements, the challenged action would not have occurred. (*Chism v. Washington State* (9th Cir. 2011) 661 F.3d 380, 386; *Olvera v. County of Sacramento* (E.D.Cal. 2013) 932 F.Supp.2d 1123, 1152.)

California pattern jury instruction CACI No. 3052 provides the elements of a section 1983 claim based on the use of fabricated evidence. That instruction *requires the jury* to determine whether the plaintiff was deprived of a liberty interest because of the defendant's conduct, and informs the jury that in deciding whether the plaintiff was deprived of a liberty interest because of the fabrication of evidence, it must determine what would have happened if the false evidence had not been used against the plaintiff. In this case, the jury was given an instruction drawn from CACI No. 3052.[4]

_____

[4] The jury was instructed as follows:

"Plaintiff Casey N[.] claims that Birgitt Walpus and/or Minda Herman either, deliberately or with reckless disregard for the truth, presented evidence obtained by using trickery, coercion or duress; presented evidence that was false or with reckless disregard for it's [*sic*] truth or falsity; or failed to disclose exculpatory evidence; and that as a result of this she was deprived of her constitutional right to familial association with her daughter.

"In order to establish this claim Ms. N[.] must prove all of the following:

"1. That Birgitt Walpus and/or Minda Herman fabricated or misrepresented evidence or omitted known exculpatory evidence either deliberately or with reckless disregard.

"2. That the fabricated or misrepresented evidence or omitted exculpatory evidence was material to the juvenile dependency proceeding.

"3. That because of either Birgitt Walpus and/or Minda Herman's conduct Ms. N[.] was deprived of her constitutional right to familial association.

10

On a motion for summary judgment in a section 1983 claim based on judicial deception, the court determines materiality. "Causation is generally a question of fact for the jury. [Citation.] But whether the plaintiff has presented sufficient evidence of causation [in a section 1983 case] to defeat a motion for summary judgment is a legal question. [Citations.]" (*Schneider v. City of Grand Junction Police Dept.* (10th Cir. 2013) 717 F.3d 760, 778-779; see *Marshall v. County of San Diego* (2015) 238 Cal.App.4th 1095, 1111-1117; *Chism v. Washington, supra*, 661 F.3d at p. 389; *KRL v. Moore* (9th Cir. 2004) 384 F.3d 1105, 1117; *Butler v. Elle* (9th Cir. 2002) 281 F.3d 1014, 1024; *Hervey v. Estes* (9th Cir. 1995) 65 F.3d 784, 789; *Olvera v. County of Sacramento, supra*, 932 F.Supp.2d at pp. 1151-1152; *Donnell v. City of Cedar Rapids* (N.D.Iowa 2006) 437 F.Supp.2d 904, 931 ["In a Section 1983 claim, causation is generally a jury question; only if the issue of cause is 'so free from doubt as to justify taking it from the jury,' should the court enter summary judgment"].)

At trial, however, materiality is an issue for the jury to decide. "[I]n § 1983 cases 'the presence of the requisite causation is normally a question of fact for the jury' [citations]." (*Wallace v. Powell* (M.D.Pa. 2012) 2012 U.S. Dist. Lexis 91886, *66.) The question of what would have happened in the absence of judicial deception is a question of fact to be determined by the jury. (*Kerkeles v. City of San Jose* (2011) 199 Cal.App.4th 1001, 1013; *Spencer v. Peters* (9th Cir. 2017) 857 F.3d 789, 800; see *Grassilli v. Barr* (2006) 142 Cal.App.4th 1260, 1276 [affirming liability in § 1983 case where jury instructed to decide causation].)

---

"To decide whether there was a deprivation of rights because of the fabrication, misrepresentation or omission, you must decide what would have happened if the fabrication or misrepresentation had not been used against Ms. N[.].

"Merely negligent conduct may not form the basis of a claim under 42 USC section 1983. Defendants cannot be liable for omitting exculpatory evidence if Casey N[.] knew of and had a full and fair opportunity to present exculpatory evidence at the jurisdictional and disposition hearings."

11

The earlier opinion in this case acknowledges this rule of law. Another panel of this court held: "A recognized basis for a Section 1983 claim occurs when a social worker provides false or fabricated evidence and withholds exculpatory evidence in dependency court proceedings. [Citations.] Moreover, contrary to the individual defendants' contention, the unrebutted claim of falsified evidence *could lead a reasonable jury to conclude* the dependency court was influenced by the individual defendants' conduct, and the inaccurate and incomplete evidentiary presentation contributed to the finding [Casey] lacked credibility." (*N[.] v. County of Orange, supra,* G050930, italics added.)

The trial court did not err by permitting the jury to decide the issue of materiality at trial.

B. *Any Error Was Harmless.*

Casey contends that, even if the trial court erred by permitting the jury rather than the court to determine materiality, the error is harmless. We agree.

In the minute order denying defendants' motion for JNOV and motion for a new trial, the trial court found the misrepresentations and omissions by Walpus and Herman were material: "The materiality of the foregoing omissions is manifest when considered in light of the [Juvenile] Court ruling at the jurisdictional hearing. For example, in relating reasons for its finding that the mother was causing emotional harm to the child, the [Juvenile] Court observed: [¶] 'As a starting point there was no evidence offered at trial sufficient to support a finding that the child was ever sexually molested by her father. This is important because if there was credible evidence that the child had, in fact, been molested, then the mother's actions to encourage and facilitate the child's reporting could be construed as a justifiable attempt to protect the child from further abuse and further would constitute a superseding cause of the child's emotional distress.' [¶] Given the omitted evidence would have been sufficient to support a finding of sexual abuse, the [juvenile] Court made it clear that if it would have been presented, it would

12

have changed the result.  [¶] The Court concludes that false statement in the amended petition and the omission of the various reports noted above were material and, if the false statement and omissions had not been made, it could well have changed the outcome of the dependency proceedings."  Therefore, the trial court concluded any error in allowing the jury to determine materiality was harmless as a matter of law because the same result would have been reached if the court had determined materiality before trial.

Defendants contend these are merely the trial court's "after-the-fact," "generalized" statements.  To the contrary, these comments specifically address the issue of whether materiality was an issue of fact for the jury or an issue of law for the court. The trial court concluded that had it considered materiality preliminarily, it too would have found the actions and inactions by defendants were material.  Therefore, even if the trial court erred by failing to determine materiality before trial, the error was not prejudicial.

II. *Substantial Evidence Supported the Verdict Against Walpus and Herman.*

Defendants contend the judgment against Walpus and Herman must be reversed because it is not supported by substantial evidence.  The jury found both Walpus and Herman deliberately or with reckless disregard fabricated or misrepresented evidence or omitted known exculpatory evidence, other than exculpatory evidence that was known to Casey and which she had a full and fair opportunity to present at the jurisdiction and disposition hearings.

A. *Standard of Review*

In determining whether substantial evidence supports the judgment, "we review the evidence in the light most favorable to the prevailing party and 'presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.'  [Citation.]  Reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury verdict.  [Citation.]"  (*Quintero v. Weinkauf*

13

(2022) 77 Cal.App.5th 1, 5.) In order to establish her section 1983 claim based on judicial deception, Casey was required to prove Walpus and Herman made deliberate falsehoods or acted in reckless disregard for the truth, and, but for their dishonesty, Casey would not have lost custody of the minor. (*Marshall v. County of San Diego, supra*, 238 Cal.App.4th at p. 1112; see *Bravo v. City of Santa Maria* (9th Cir. 2011) 665 F.3d 1076, 1083; *KRL v. Moore, supra*, 384 F.3d at p. 1117.)

B. *Substantial Evidence Supported the Jury Verdict.*

Both the addendum report authored by Walpus and the jurisdiction report authored by Herman state no sexual abuse occurred, and Casey was planting the stories in the minor's head. The amended petition, which tracked these reports, alleged: "By her actions, mother has intentionally or unintentionally influenced the child to continue to make disclosures of sexual abuse that are *contradicted and/or cannot be substantiated by credible evidence*." (Italics added.)[5] However, substantial evidence supported the jury's finding these statements were not believed or should not have been believed by Walpus and Herman when they were made.

In an addendum report signed February 25, 2009, Walpus wrote: "To put it plain and simple, this is a nasty Family Law case that involves the child, . . . and *it is the undersigned's opinion that the child's mother is feeding information or coaching information to the child . . . .*" (Italics added.) At trial, Walpus admitted she did not have any evidence Casey was coaching the minor or feeding information to the minor. Walpus did not advise the juvenile court judge that statement was not supported by evidence. Her excuse was "I wasn't asked."

---

[5] Although the amended petition was drafted and signed under penalty of perjury by county counsel and not by Herman, Herman testified she had requested the petition be amended and she had provided the facts to county counsel for inclusion in the amended petition. County counsel testified that if Herman had told her the statements in the amended petition were misrepresentations, she would not have filed it.

In the February 2009 addendum report, Walpus wrote: "The undersigned *firmly believes* that the child . . . has been subject to emotional abuse by the child's mother, Casey . . . ." (Italics added.) At trial, Walpus testified she did not know whether the facts on which she based this claim were true.

In the jurisdiction report, Herman wrote: "The undersigned remains highly concerned about the fact that the child believes she has been sexually assaulted by her father and readily discloses her beliefs with minimal to no prompting by adults. In short, although the undersigned does not believe the minor was, in fact, digitally penetrated on November 22, 2008 at the Sun Valley Pediatric Urgent Care Center, the minor's persistence provides ample disquiet. The undersigned cannot state with any certainty that [the minor] has not been sexually abused in the past and the fact that she continues to disclose that she has been cannot be ignored. The undersigned cannot state with any certainty that [the minor] has been coached or otherwise influenced to disclose sexual abuse. Thus, the undersigned believes that a[n Evidence Code section] 730 Evaluation of the child, her mother and father will provide additional and objective insight as to the nature of the sexual abuse allegations in this case and to address the most appropriate venue for visitation. [¶] The undersigned believes the petition should be amended to reflect the issues stated above and that the child is in need of the protection of the Court. The undersigned further believes [the minor] is in need of continued therapeutic intervention as are her biological parents to better understand the child's beliefs and how to best deal with them as a unit despite their divorce."

At trial, Herman admitted she "could not definitively state that" Casey had coached the minor. Herman also admitted that while her jurisdiction report was facially neutral and she did not have "clear and convincing evidence" of either sexual abuse or of coaching, the petition alleged emotional abuse by Casey and did not allege sexual abuse by Scott.

15

The amended petition, which was based on Herman's recommendations in the jurisdiction report, alleged: "The child has had at least two physical examinations, and has been in therapy with at least two different therapists." The trial court found: "In the full context of the amended petition, along with the statement that abuse 'cannot be substantiated by credible evidence,' it is made to appear that [the minor]'s physical examinations and therapists produced no evidence of abuse. The contrary is true."

Both reports omitted or misleadingly described the following information, which was in Walpus and/or Herman's possession and which would have had a tendency to support allegations Scott had sexually abused the minor.

• In September 2007, after being informed that the minor had made allegations of sexual abuse against Scott, Antoinette del Valle, the minor's pediatrician, told Casey "[the minor] was not making this up. The details of these things are not something a child of this age is capable of imagining." A few days later, del Valle diagnosed the minor with "vaginitis and/or urethritis secondary to external irritation from an unclean source" which was suggestive of sexual abuse.

• A nurse practitioner with the Orange County Child Abuse Service Team (CAST) summarized a forensic interview in which the minor disclosed Scott had digitally penetrated her, and stated the findings "may be caused by sexual abuse or other mechanisms," and "[w]hile not specific, these findings are consistent with her disclosure of sexual abuse."

• Jonathan Stiansen, a marriage and family therapist intern who had been working with the minor in therapy in San Bernardino, stated in December 2007 the minor "still exhibits symptoms of sexual abuse as evidenced by recurrent nightmares and episodes of bedwetting" and the minor had developed an imaginary person who "does bad touches with children."

• Dr. Toni Wein, a licensed marriage and family therapist, had engaged in therapy with the minor from February 2008 through March 2009. Wein concluded the

16

following: "I was able to determine that *the sexual abuse and inappropriate sexual conduct was indeed a real occurrence*, and that *this child was in no way falsifying the disclosures*. Due to the consistency of the client in all areas i.e. verbalization, behavior, demeanor, body language and play over the course of a year I was able to reach a conclusion determining that *abuse did occur*. Client showed no signs of being coached, never wavered from the disclosures over the course of a year, and became more articulate and concise as she grew in development. Client always presents as age appropriate." (Italics added.)

      • Dr. Thea Reinhart, a licensed marriage and family therapist who tested and treated Casey in late 2009 found no evidence Casey had coached the minor to report sexual abuse. "It is understood that there are cases where false allegations are made. In the case of [Casey], there appears to be no history of coaching or having sinister motives to destroy the father-daughter relationship. During this evaluation, there was no communication nor behavior exhibited by her that would lead to this conclusion." Reinhart also found Casey did not exhibit any behaviors or symptoms of Munchhausen by Proxy.

      • Detective Joycelyn Thomas, the investigating officer from the San Diego Police Department, reported in July 2008 that Scott cancelled a scheduled polygraph examination appointment, and she was "unable to eliminate him as a suspect in my case because of his failure to cooperate." Thomas also reported Casey and her new husband submitted to polygraph examinations and "showed no deception regarding molesting [the minor] or encouraging her to make the statements for custody matters."[6] Herman was

---

[6] Casey's polygraph questions and responses were as follows:

"Did you make up a story about Scott molesting [the minor] in order to get custody? Response, 'No.'

"Did you tell your daughter to falsely accuse Scott of molesting her? Response, 'No.'

17

aware Scott had refused to take a polygraph test, and the detective investigating the case in San Diego had recommended criminal prosecution.

The Agency had an official policy that supporting evidence from professionals such as law enforcement, medical professionals, school personnel, therapists, and psychiatrists, among others, should be incorporated in dependency case reports in their entirety wherever possible. Failing to include the above-referenced information in full in the reports provided to the juvenile court in this case violated that policy.

Defendants rely on *Reynolds v. County of San Diego* (S.D.Cal. 2016) 224 F.Supp.3d 1034, 1055-1056, in which the court, on summary judgment, determined any "possible misstatement" in reports filed with the dependency court did not violate the parents' constitutional rights. Although the words "'suspected'" and "'concerning'" were omitted from quoted material in the reports, this was merely "a reporting error or misstatement," which "did not conceal contrary evidence that would have influenced the decision maker's factual conclusion." (*Ibid.*) The social worker's reports in that case were "a fair summary of the evidence at the time." (*Ibid.*) In this case, by contrast, the juvenile court stated its decision would have been different if there had been evidence before the court supporting an allegation of sexual abuse. Therefore, it cannot be said the omission of the evidence cited above was immaterial as a matter of law.

---

"Have you inserted your finger into [the minor]'s vagina for your sexual gratification? Response 'No.'

"Are you the person who inserted their finger into [the minor]'s vagina for sexual gratification? Response, 'No.'"

The polygraph examiner concluded: "It is my opinion, based upon my examination of the subject's polygraph charts, that she was being truthful when she answered the relevant questions." Casey's new husband was asked similar questions and provided similar responses; his answers, in the examiner's opinion, were not indicative of deception.

18

C.  *Casey Did Not Have a Full and Fair Opportunity to Present the Withheld or Misleading Information to the Juvenile Court.*

Defendants argue that because the evidence Walpus and Herman allegedly hid from the juvenile court was known to Casey or in her possession and she had an opportunity to present it to the juvenile court, defendants cannot be liable for failing to present it to the juvenile court themselves.  (*Reynolds v. County of San Diego, supra*, 224 F.Supp.3d at p. 1056 [no violation of parents' constitutional rights when parents had full opportunity to present exculpatory evidence they claimed the social workers failed to produce].)

The appellate record contains substantial evidence that Casey did not have a full and fair opportunity to present the exculpatory evidence to the juvenile court.  Casey testified that both Walpus and Herman assured her they would put all of the evidence before the Court at the jurisdictional hearing:  "I was told by both Birgitt and Minda, that this was their . . . deal; that they were subpoenaing everyone, that they were putting on all the evidence, that this was their show and they were putting all the evidence in and all of the witnesses in."  Casey also testified Herman had assured her "everything was before the Court; that [the juvenile court judge] had everything that he needed to see."  Casey's juvenile court counsel believed, because the petition had been amended to exclude the sexual abuse count, evidence that would otherwise have been offered was not relevant at the jurisdiction hearing:  "As this case is pled and as it presents itself to the court today, I'm not in position or mother is not in a position to either argue or present any evidence to support a nonexistent [Welfare and Institutions Code section 300, subdivision] (B) allegation, so I'll respond to the evidence that's presented to the court as it's currently pled."

At the end of the jurisdiction hearing, the juvenile court initiated the removal of the minor from Casey's custody.  Casey's juvenile court counsel objected:  "The record should reflect I do have some due process concerns.  . . . [I]f the Court were

19

to make some wholesale change in placement or custody, my due process concerns and objections would be such that this was set for jurisdiction. As the Court knows, there's occasions when we were tactically precluded from presenting evidence that would go towards disposition, and knowing it was Juris[diction] we tailored our evidence accordingly. . . . [¶] I find myself in a position of feeling to make best efforts to advocate to the Court why the child should remain the mother's home, and yet not having an opportunity to present what could have been appropriate evidence to the Court in that concern."

Further, Casey testified at the section 1983 trial she was prevented from offering the evidence at the disposition hearing because she was coerced into signing the stipulation granting custody to Scott under threat of having her parental rights to the minor terminated. "[W]e were finally going to subpoena, have everybody there to testify as to the placement for [the minor] and what's in her best interest, and have everybody come and talk and testify and say what really happened. And I was met . . . outside of the courtroom with a case plan from social services and a stipulated agreement that said I was going to give up custody and give it to Scott, and that if I didn't sign it, they would just go after terminating my rights." Casey stated on the record at the disposition hearing she had entered the stipulation freely and voluntarily; her testimony at the section 1983 trial, however, is substantial evidence she was involuntarily prevented from going forward with the disposition hearing and presenting evidence.

In an addendum report filed in June 2009, after the amended petition was filed, Herman quoted an exchange with Casey in which Casey specifically asked why the above-referenced evidence had not been provided to the juvenile court. "As I was reading through the new allegations, I was a little confused. For the first time ever, the thought crossed my mind that [the Agency] along with Scott have the intention to remove [the minor] from her home and family. I am at a loss for words. How can a child be in jeopardy of such a thing because they told the truth? How can a parent be persecuted for

20

trying to protect their children?  Why hasn't any one talked to the therapists that have seen [the minor]?  It seems that they would have helpful insight.  Jon Sti[a]nsen and Dr. Wein's opinions have never been mentioned in the CPS reports."  Herman's written response to Casey was as follows:  "With regard to the new petition, the comments you made in writing as well as documentation and testimony from a variety of sources will be heard and evaluated by the bench officer.  As a direct result of that information, the petition may well be amended or changed to more closely reflect the truth as all parties see it rather than just one.  The attorneys involved in the case will argue to fine tune the document after testimony concludes and that may well include adding phrases/counts, deleting phrases/counts or otherwise changing the current petition.  *The new documentation/testimony will include information from UCI Focus as well as Dr. Wein's comments.*"  (Italics added.)

The importance of the social worker's reporting and recommendations in the dependency process cannot be overstated.  "[T]he court's independent review of the evidence should also give due consideration to the social worker's determination and the court may properly rely upon the agency's expertise for guidance.  [Citations.]" (*In re M.C.* (2011) 199 Cal.App.4th 784, 814; see *In re Robert A.* (1992) 4 Cal.App.4th 174, 189 [juvenile court depends on the social services department's expertise for guidance].)

"The juvenile court may properly rely upon a social worker's report to support a jurisdictional finding under [Welfare and Institutions Code] section 300 as long as the opportunity to cross-examine the social worker is provided.  [Citations.]"  (*In re Brian W.* (1996) 48 Cal.App.4th 429, 433-434.)  "In addition to providing child welfare services to the family involved in a dependency proceeding, the county's social services agency provides essential information to the court.  At each stage of the dependency proceeding, the social services agency is statutorily mandated to prepare social study reports and make recommendations to assist the court.  [Citations.]  In this role, the social

21

services agency acts as an impartial arm of the court in assisting the court to carry out the Juvenile Court Law. [Citations.]" (*In re Ashley M.* (2003) 114 Cal.App.4th 1, 7-8.)

III. *Walpus and Herman Were Not Entitled to Qualified Immunity.*

Defendants argue Walpus and Herman were entitled to qualified immunity from Casey's claims against them. "Government employees generally are shielded by qualified immunity 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' [Citation.] Qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.' [Citation.]" (*Jimenez v. County of Los Angeles* (2005) 130 Cal.App.4th 133, 144.)

"Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.' [Citation.]" (*Pearson v. Callahan* (2009) 555 U.S. 223, 231.) To determine whether qualified immunity applies, the court makes a two-pronged inquiry: (1) has a constitutional right been violated, and (2) was that right clearly established at the time of the defendant's alleged misconduct? (*Saucier v. Katz* (2001) 533 U.S. 194, 200-201.) There is no dispute as to the first prong.

The United States Supreme Court has held, for purposes of determining whether qualified immunity applies, "'[c]learly established' means that, at the time of the officer's conduct, the law was '"sufficiently clear" that every "reasonable official would understand that what he is doing"' is unlawful. [Citations.] In other words, existing law must have placed the constitutionality of the officer's conduct 'beyond debate.' [Citation.] . . . [¶] To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be 'settled law,' [citation],

which means it is dictated by 'controlling authority' or 'a robust "consensus of cases of persuasive authority,"' [citations]. It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. [Citation.] Otherwise, the rule is not one that 'every reasonable official' would know. [Citation.] [¶] The 'clearly established' standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' [Citation.] This requires a high 'degree of specificity.' [Citation.] We have repeatedly stressed that courts must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.' [Citation.] A rule is too general if the unlawfulness of the officer's conduct 'does not follow immediately from the conclusion that [the rule] was firmly established.' [Citation.]" (*District of Columbia v. Wesby* (2018) ___ U.S. ___ [138 S. Ct. 577, 589-590].)

Both Casey and defendants argue the ruling on the merits of the case decides the ruling on qualified immunity. Casey cites *Butler v. Elle, supra*, 281 F.3d at page 1024, in which the Ninth Circuit held the doctrine of qualified immunity merges with the merits in a case alleging judicial deception in the procurement of a search warrant. If this is true, then based on the analysis of substantial evidence, *post*, Walpus and Herman are not entitled to qualified immunity. Neither party addresses whether this argument would make the defense of qualified immunity meaningless—if the defense only applies when the evidence proves no violation occurred, and does not apply when a violation occurred, it is not actually a defense.

More importantly, the jury found Walpus and Herman's actions were "malicious, oppressive or in reckless disregard of [Casey]'s rights" and therefore awarded

23

punitive damages against them. Because the individual defendants acted in reckless disregard of Casey's rights, then it cannot be said that "[their] conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' [Citation.]" (*Butler v. Elle, supra*, 281 F.3d at p. 1021.)[7] Therefore, Walpus and Herman were not entitled to the protection of qualified immunity.

*Kirkpatrick v. County of Washoe* (9th Cir. 2016) 843 F.3d 784 (*Kirkpatrick*), does not change our analysis. In that case, social workers took a newborn into custody without a warrant, and the presumed father later filed a section 1983 claim. (*Kirkpatrick, supra,* 843 F.3d at pp. 787-788.) The appellate court held the social workers' constitutional obligation to obtain a warrant before taking custody of the child "was not clearly established." (*Id.* at p. 797.) "No matter how carefully a reasonable social worker had read our case law, she could not have known that seizing [the newborn] would violate federal constitutional law. Without that fair notice, the social workers in this case are entitled to qualified immunity." (*Id.* at p. 793.)

*Kirkpatrick*, however, is factually distinct from the present case. The newborn in that case tested positive for methamphetamine at birth and the mother admitted using methamphetamine throughout her pregnancy. The mother's two other children were in social services' custody and a permanent plan to terminate the mother's parental rights had been approved by the court due to her failure to comply with her case plan and her demonstrated inability to care for her children. The newborn was placed with her half-siblings in foster care after being taken from the hospital by social services. The hospital was not obligated to comply with the protective hold placed on the newborn by social services. (*Id.* at pp. 786-787.) Given the facts of *Kirkpatrick*, the social workers in that case could not have reasonably known their actions would violate the

---

[7] Defendants do not separately challenge the jury's findings regarding punitive damages.

24

parent's due process rights. The same cannot be said for Walpus and Herman in the present case.

IV. *Substantial Evidence Supports the County's Liability Under* Monell.

"[A] municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." (*Monell, supra*, 436 U.S. at p. 691.) To sustain her section 1983 claim against the County, Casey was required to prove (1) she was deprived of a constitutional right, (2) the County had a policy which amounted to "'deliberate indifference'" to Casey's constitutional right, and (3) an that action taken pursuant to that policy violated Casey's constitutional right. (*Zuniga v. Housing Authority* (1995) 41 Cal.App.4th 82, 103-104.) Whether the County had a policy leading to liability under *Monell* can be established by showing (1) it is an official policy, (2) it is a longstanding practice or custom that has become a standard operating procedure, (3) the individual tortfeasor is an official whose acts represented official policy, or (4) an official with policy making authority ratified the decision of a subordinate. (*Price v. Sery* (9th Cir. 2008) 513 F.3d 962, 966.)

The trial court made the following findings regarding the County's liability under *Monell*:

1. The County had an official policy or custom of using false or misleading evidence, or in failing to disclose exculpatory evidence, in preparing and presenting reports, documents, and testimony to the juvenile court.

2. Walpus and Herman acted because of this official policy or custom.

3. The County's training program for social workers was inadequate.

4. The County knew or it should have been obvious to the County that, because of a pattern of similar violations, the inadequate training of its social workers was likely to result in a deprivation of Casey's right to familial association.

25

5.  The failure to provide adequate training was the cause of the deprivation of Casey's right to familial association.

We review to determine whether substantial evidence supports these findings.

A. *Policy or Custom of Providing Misleading Information*

All of Walpus and Herman's reports were approved by a social services supervisor, implying managerial authorization of the contents of those reports.

In 2007, a jury in a separate case had found the County liable based on judicial deception by social workers in another child dependency matter. That case was factually similar to the present one. In the wake of a divorce, children of the marriage reported sexual abuse by their father to a therapist. A dependency petition was filed and the children remained in the mother's custody. After issues with visitation arose, the social worker lied to the juvenile court about the mother's interference with the father's visitation. The children were removed from her custody and placed in foster care. The children's therapist reported to the Agency that the children "exhibited significant emotional distress in their placement," but the social worker told the juvenile court the children "were doing well" in placement. Ultimately, the mother signed a voluntary case plan to get the children released from foster care; the case plan gave custody of the children to the father, with the mother having monitored visitation. (*Fogarty-Hardwick v. County of Orange* (June 14, 2010, G039045) [2010 Cal.App.Unpub. Lexis 4436] (*Fogarty-Hardwick*).)[8]

The mother sued the County for various claims, including a claim under section 1983 for violation of her constitutional right to familial association. The mother claimed "that the County's social workers had relied upon 'intentional[ly] false

_____

[8]  A fuller summary of the facts is available in the unpublished opinion, *Fogarty-Hardwick, supra,* G039045.

26

statements,' fabricated evidence, and 'perjury' as part of a successful effort to convince the juvenile court to remove her daughters from her custody and place them in foster care." Damages were awarded against the social workers and the County. Another panel of this court affirmed the damages award. (*Fogarty-Hardwick, supra,* G039045.)[9] The *Fogarty-Hardwick* jury found the social worker's conduct causing the mother's loss of familial association occurred as a result of the County's official policy or custom.

The facts of this case and *Fogarty-Hardwick* are similar, although they are not identical. The *Fogarty-Hardwick* social workers out-and-out lied in their reports and in testimony to the juvenile court regarding the mother's actions and statements and how the children were doing in foster placement. Here, the social workers are accused of failing to include all information in their reports, or presenting the information in a misleading way. In the *Fogarty-Hardwick* case, the County "represented in discovery that its social workers (whom the jury concluded had lied and fabricated evidence) 'acted pursuant to municipal policy and custom.'" (*Fogarty-Hardwick, supra*, G039045.) There was no evidence any County policies had changed between the time this court's opinion in *Fogarty-Hardwick* issued and when Walpus and Herman filed the reports at issue in this case.

The amount of time between the event underlying the *Fogarty-Hardwick* case (November 1999 to May 2000) and those of the present case (December 2008 to April 2010) would tend to indicate the acts of the social workers were not part of a policy by the County. But the time between the appellate opinion in the *Fogarty-Hardwick* case and the alleged bad acts of the social workers in the present case are not that remote in time. (See *Henry v. County of Shasta* (9th Cir. 1997) 132 F.3d 512, 518-519 [three factually similar constitutional violations occurring within 10 months].)

---

[9] This court reversed the portion of the judgment containing injunctive relief.

27

In *Fogarty-Hardwick*, the jury found the social worker's conduct—lying in dependency reports and during hearings in the dependency court—occurred as a result of the County's official policy or custom, and the County's training or supervision of social workers was inadequate. The jury further found the social worker's conduct led to the mother's loss of custody of her children. In 2007, this court affirmed those findings. When essentially the same thing happened one to two years later, it is fair to say the official policy of the County had not changed and the training provided by the County had not improved.

After the verdict in the *Fogarty-Hardwick* case, the Agency sent a memorandum to all Agency staff: "'It was determined at the time, that the social services workers involved in this case acted entirely appropriately and within the scope of their employment throughout the events that transpired in this case.'" This, too, reflects management's approval of the actions of the social workers in both cases.

All of the foregoing supports the jury's finding the County had a policy or custom of using false or misleading evidence of failing to include exculpatory evidence in dependency reports.

B. *Inadequate Training*

The jury also found the County was liable under *Monell* for a policy of inaction due to a failure to train social workers and provide appropriate policies to guide their actions. "[A] policy of inaction is based on a government body's 'failure to implement procedural safeguards to prevent constitutional violations.' [Citation.] In inaction cases, the plaintiff must show, first, 'that [the] policy amounts to deliberate indifference to the plaintiff's constitutional right.' [Citation.] This requires showing that the defendant 'was on actual or constructive notice that its omission would likely result in a constitutional violation.' [Citation.] Second, the plaintiff must show 'that the policy caused the violation in the sense that the municipality could have prevented the violation

28

with an appropriate policy.' [Citation.]" (*Jackson v. Barnes* (9th Cir. 2014) 749 F.3d 755, 763.)

"A plaintiff can satisfy this requirement [of deliberate indifference] by showing that 'the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need.' [Citation.]" (*Kirkpatrick, supra*, 843 F.3d at p. 793.) The appellate opinion in *Fogarty-Hardwick* showed the need for more or different training was obvious.

Herman's training records show she took a mandatory course in avoiding civil liability in child welfare cases in 2012. Casey argues the County did not start to offer this training course until 2012, long after the events underlying this case occurred; Herman only testified that was when she took the course. The jury could reasonably infer that if Herman did not take a *mandatory* training until 2012, it was not offered long before that date. Further, avoiding civil liability is not the same as ensuring a parent's due process rights are not violated. (A printout of the PowerPoint presentation from this training class was admitted at trial as exhibit No. 43-8 through 43-85, but this exhibit does not appear in the appellate record.)

Herman testified she could not recall specific training on how to amend a petition. Herman also testified she would have received training as to "parents' civil rights as in the right to familial association, the right to due process, [and] the right to a fair trial" at her initial training to become a senior social worker in 2005.

In the *Fogarty-Hardwick* case, the jury found the County's training was inadequate, the County was deliberately indifferent to the need to train its employees adequately, and the lack of proper training was the cause of the plaintiff's loss of familial association. As noted *ante*, the fact a similar violation occurred soon after this court affirmed the *Fogarty-Hardwick* jury's findings indicates the training offered to social workers was not improved. (Compare *Connick v. Thompson* (2011) 563 U.S. 51, 62-63

29

[four reversals of convictions due to *Brady* violations over 10 years did not put officials on notice that *Brady* training was inadequate because the violation in the present case was a different type of *Brady* violation].)

Substantial evidence supports the County's liability under *Monell*.

DISPOSITION

The judgment and postjudgment orders are affirmed. Respondent to recover costs on appeal.


O'LEARY, P. J.

WE CONCUR:


GOETHALS, J.


SANCHEZ, J.

30